**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jaime L. FERRA, Defendant–Appellant.**

No. 89–1507.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1989.

Decided April 24, 1990.

---

Maxine A. White, Matthew L. Jacobs, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Julius L. Echeles, Chicago, Ill., Paul E. Sicula, Atinsky, Kahn, Sicula & Teper, Milwaukee, Wis., for defendant-appellant.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Jaime Ferra was a fence specializing in weapons. He is in prison for selling both guns and cocaine to undercover agents. The district court departed from the Sentencing Guidelines, giving Ferra 120 months' imprisonment instead of the 41–51 months they prescribe. Although Ferra's appellate lawyer raises a dozen issues, only four call for comment: the adequacy of hearings on motion to suppress evidence and exclude co-conspirator hearsay, the propriety of an instruction telling the jury that errors of law are corrected on appeal, and the departure from the Guidelines.

**1.** In April 1988 a state judge issued a warrant authorizing a search of Ferra's tavern. The judge acted on the basis of oral testimony by detective Kenneth Leger of the Milwaukee police. Leger testified that a "confidential informant, along with another unknown person", had purchased cocaine from Ferra in that building within the last 72 hours. Leger also testified that the informant, whom he had known for five years, had furnished reliable information on numerous occasions. Counsel moved before trial to suppress the fruits of the search: cocaine, guns, and cash. The district judge denied the motion because Leger's description of the informant's reliability established probable cause. Leger did not testify at Ferra's trial. Sergeant Vincent Flores, who did, testified that his purchase of cocaine in the company of one "Nicky" was the basis of detective Leger's testimony in support of the warrant. According to Flores, "Nicky", who could no longer be located, was not a regular informant and did not even know that Flores was a police officer. Counsel renewed his motion to suppress and asked for a new hearing, arguing that Flores contradicted every material feature of Leger's testimony in support of the warrant; the district judge declined to take additional evidence on the subject and denied the motion.

Leger described a reliable informant who made a buy in the presence of an "unknown person". Flores described visiting Ferra's bar and using the services of Nicky, who was not an informant, to buy $\frac{1}{16}$ ounce of cocaine for $50 and a stolen microwave oven. Flores testified to events that demonstrate probable cause for a search, but these are not the events relayed to the state judge; if Ferra is correct, what the state judge was told is fiction. Then the evidence must be suppressed, because having probable cause is not enough; the police must present the facts establishing that cause to the judicial officer. *Whiteley v. Warden*, 401 U.S. 560, 564–65, 91 S.Ct. 1031, 1034–35, 28 L.Ed.2d 306 (1971). It may be, however, that Leger and Flores were describing different buys, and that the informant to whom Leger referred is not Nicky. (Although Flores testified that his buy with Nicky was the basis of Leger's testimony, the two described transactions on different dates.) Perhaps Nicky was Leger's informant unbeknownst to Flores, and Nicky told Leger what had happened ignorant that the person with him at the time was an officer. These questions were well worth the court's time to explore, because on one view of the facts the evidence must be suppressed and on another the warrant stands. We shall remand the case for an evidentiary hearing on this question. Because the district court may conclude that the evidence is

admissible, and because the other questions in this case may recur in a new trial if it is not, we shall press on.

**2.** Some of the testimony against Ferra concerned statements Israel Salva made. The prosecution depicts Salva as Ferra's co-conspirator; Ferra insists that Salva was simply a buyer of Ferra's guns. The evidence allows the district court to find by a preponderance, as Fed.R. Evid. 104 requires, see *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), that Salva and Ferra were co-venturers. An agent initially bought guns from Ferra through Salva, who turned the money over to Ferra; Ferra told the agent to go through Salva if he wanted to buy more. After Salva decided to cooperate with the government, he and Ferra had a recorded conversation in which Ferra undertook to supply additional guns through Salva. This recording did not become inadmissible on the theory that conversations after one conspirator has been "turned" cannot possibly be in furtherance of the conspiracy. Whether such an exchange is admissible depends on whether the conspiracy is over, which depends in part on whether the conspirator-turned-informant has withdrawn. Although the inference that a turncoat has withdrawn is strong, it is not inevitable, and the decision rests in the hands of the district judge. *United States v. Patel*, 879 F.2d 292 (7th Cir.1989). Anyway, parts of this conversation damning to Ferra were his own words, which could come in as admissions no matter Salva's status. Fed.R.Evid. 801(d)(2)(A).

The difficulty concerning all of Salva's statements is that Rule 104 calls for the district judge to make a preliminary determination that the declarant was a conspirator acting in furtherance of the criminal adventure. Ferra objected when the prosecutor first offered Salva's hearsay statements. The district judge declined to entertain evidence or make the findings required by Rule 104. See *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978). Instead, the judge observed that

if I am told by the proponent of the evidence that that's what it is [co-conspirator declarations], why, then I would overrule the objection subject to [a] sanction. . . .

The "sanction" the judge had in mind was that if "the evidence of the conspiracy does not come forth", then there would be a mistrial.

Although we have approved admission-subject-to-connection under Fed.R.Evid. 104(b), see *United States v. Troop*, 890 F.2d 1393, 1404 n. 18 (7th Cir.1989); *United States v. Andrus*, 775 F.2d 825, 836–37 (7th Cir.1985), this is an exceptional rather than a routine procedure. *Andrus* and *Troop* imply that it is appropriate only when the evidence on the question of conspiracy is extensive—which it is not in Ferra's case. Most of the time it is best to make a preliminary determination rather than to attempt at the end of the case to recollect whether the evidence satisfies the standard for admissibility. No one wants to retry criminal cases if something goes wrong in the process of supplying the foundation for the evidence. Especially not when there is a potential double jeopardy problem. Defendants ordinarily are entitled to a final decision by the first tribunal. Although a defendant's motion for a mistrial releases the strict "manifest necessity" standard, see *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), a court ought not routinely build into the case a feature that will force the defendant to move for mistrial in order to make a simple objection to the admission of evidence.

Even in a fairly complex case, the district judge should require the parties to state what they believe the evidence will establish and then decide whether that will suffice. The prosecutor will have to make good his promise, but at least everyone will know in advance that the prosecutor needs to establish such-and-such, and that doing so will carry the day. When the district judge brushes off the hearsay objection, the prosecutor does not know what is necessary or sufficient, and the subject may get lost amidst the many other issues. That may well have happened in Ferra's

trial. We cannot find a definitive ruling in the record. Although at the end of the trial the judge said that "there are declarations in [the tape] that are in furtherance of the conspiracy", he did not explain why, or what distinguishes these from others. How to treat the words of a conspirator-turned-informant is a question of some delicacy, as *Patel* shows. As this case is being remanded to reconsider the basis of the April 1988 search warrant, we shall ask the district judge to make a focused decision on the co-conspirator hearsay question as well.

██ 3. The instructions to the jury in *United States v. Fiorito*, 300 F.2d 424, 426 (7th Cir.1962), included this passage:

> I had certain reasons when I sustained an objection, because I don't want to retry it again, I don't want to rehash certain parts of it again. You have heard it. If you forget it, that is part of the game, and if I forget it, that's part of the game. That's why we have a court of appeals, they will reverse me if I'm wrong. This is not the final judgment, there is a court of appeals to reverse me and a Supreme Court to review them. That's why we have a great system here.

Fearing that the jury may have understood the invitation to "forget it" to refer to the evidence or limiting instructions given in conjunction with its admission, and concerned that the reference to appellate review may have led the jurors to think that if they did "forget it" someone else would put things to rights, the court reversed the conviction. "[I]t was inferred [sic] that the jury's determination was not to be the final one but would be reviewed by this Court and the United States Supreme Court. Such dilution of the final responsibility of the jury as was thus inferred [sic] as permissible to the jury in its determination of the verdict is prejudicial to a defendant." *Id.* at 427.

The judge instructed Ferra's jury this way:

> Your purpose as jurors is to find and determine the facts, the truth under our system. In a criminal procedure, you are the sole judges of the facts.... It is especially important that you perform

your duty of determining what the facts are diligently and conscientiously because you are the only ones that ever do that.

> If I tell you what the law is and I tell you wrong, why, an appellant court can straighten me out, but nobody else determines what the facts are. You do that, and so it's important that you do it with devotion to the task.

> On the other hand, and with equal emphasis, I would instruct you that the law that I give you constitutes the only law for your guidance. It is your duty to accept and follow the law as I tell you it exists even though, for instance, you might disagree with the law or think it's a bum law, or think that I am telling you about it wrong.

Ferra maintains that the reference to appellate review in this instruction yields "dilution of the final responsibility of the jury", *Fiorito*, 300 F.2d at 427, and calls for a new trial.

Fiorito's jury was given an "I'm OK, you're OK" instruction. Not to worry, things will take care of themselves. The court of appeals appears in Fiorito's trial as a deus ex machina to save the day. Ferra's jury was told that it must be careful and diligent, because it is the sole judge of the facts. Jurors must be conscientious, because "you are the only ones ever to do that." The court of appeals appears in Ferra's trial as a way to settle questions of law, leaving jurors as the "sole judges" of the facts.

Language in *Fiorito* appearing to forbid any mention of appellate courts should not be removed from the context of the instruction to Fiorito's jury. Truth usually promotes the operation of the judicial system. Jurors need not be left to wonder about the allocation of tasks between trial and appellate courts. Carefully phrased, as it was in Ferra's case, advice that legal errors are subject to correction helps to flesh out jurors' knowledge of their role. Most jurors are legal novices. They may believe that they are entitled to form their own views about the law; if told that legal questions are for the judge, they may rebel and vote

in the teeth of the evidence if their legal views clash with the judge's. Jurors who know that the judge's views of law are not the last word are more likely to confine themselves to their proper task—finding the facts and applying the law to them. The instruction told Ferra's jurors simply and accurately that they are judges of the facts and that the ultimate decision on points of law lies elsewhere. Such advice does not dilute the sense of responsibility but rather focuses jurors on their true responsibilities. *United States v. Miceli*, 446 F.2d 256, 259–60 (1st Cir.1971).

■ 4. Ferra was convicted of selling two guns and 5.83 ounces of cocaine. This produced an offense level of 21 which, when combined with Ferra's criminal history category of II, yielded a guideline range of 41–51 months. The district court sentenced Ferra to 120 months' imprisonment, more than twice the maximum under the guidelines. The court gave this explanation:

> Jaime Ferra was a fence, no question about it. He was a fence for a substantial number of burglars in Milwaukee. The crimes they committed were visited upon literally hundreds of homes, as I recall the one witness testified something in excess of 200 burglaries. When I think about all of the anguish and the furor and the frustration that those burglaries would cause to the people whose lives and homes were invaded, and then think about the fact that they, the burglars have got a ready market here not just even for cash, but for cocaine, which is going to feed the whole system, I feel that there are aggravating circumstances.

> .    .    .    .    .

> The pending cases in the state would indicate that the day after he's searched, why he's out dealing in cocaine again. I was struck by that. But there was a search on ... [April 22, 1988], and on 4–29–88 Milwaukee police sergeant acting in an undercover capacity purchased a 16th ounce of cocaine from Mr. Ferra at the El Moro bar.

> Based on these kinds of circumstances, the interrelationship between being a fence and payment in cocaine and the way in which that expands the crime problem in our urban community, the court does feel that defendant's criminal history category significantly underrepresents the seriousness of the defendant's criminal history, and also I think underrepresents the likelihood that he will commit further crimes. This is particularly as one takes into account all of the felony, state felony charges for concealing and receiving stolen property, and secondly, I am satisfied in my own mind that the quantity of cocaine seized underrepresents the total amount this defendant was involved with, as testified to by a number of witnesses at the trial.

Although the court explained why it was exceeding the guidelines, it did not explain why it selected 120 months.

The judge believed that Ferra's criminal history category understated his history and dangerousness for two reasons: he kept dealing in drugs after his first arrest, and he committed more crimes than he had been convicted of. The judge believed that the charges understated the seriousness of the offense for four reasons: Ferra sold more cocaine than the 5½ ounces charged; he bought stolen property, a crime with which he had not been charged; fences induce people to become burglars, which causes misery; buying stolen goods with drugs is especially serious. The statute allows departure if either the criminal history or the charge understates the seriousness of the crime, for reasons the Sentencing Commission has not adequately considered. 18 U.S.C. § 3553(b). The purchase of stolen guns for cocaine is, if nothing else, sufficiently unusual—outside the "heartland" of characteristics defined by the aggravating and mitigating circumstances specified in the guidelines, U.S.S.G. Ch. I, pt. A(4)(b), p. 1.6 (policy statement)— that a departure is authorized.

Every departure must be "reasonable" in extent, 18 U.S.C. § 3742(e)(3); *United States v. Jordan*, 890 F.2d 968, 977 (7th Cir.1989). A judge may not say: "I have decided to depart, so I now throw away the

guidelines." The guidelines are designed to bring openness and consistency to sentencing, to even out the effects of different judges' perspectives on desert and deterrence. Departures are authorized because no set of rules, however comprehensive, can capture all features that may turn out to be important. *United States v. Pinto*, 875 F.2d 143 (7th Cir.1989). Unless there is discipline in determining the amount of departure, however, sentencing disparity will reappear. One judge may think that buying stolen goods with cocaine is worth 120 months, another that it requires 180, still another that it calls only for 60 (or no departure). Almost by definition, there cannot be rules for computing the amount of departure—for if it were possible to do this, the factors could be included in the guidelines, avoiding "departures" altogether. But it is possible to formulate approaches that link the extent of departure to the structure of the guidelines.

The Sentencing Commission did this with respect to departures when the criminal history category does not adequately reflect the seriousness of the defendant's former crimes or the likelihood of his committing more. If, say, Category II is too low, then the judge should use Category III or IV rather than pitch the guidelines. "[T]he Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable." U.S.S.G. § 4A1.3 (policy statement). Even when the judge departs upward from Category VI, the most serious, the guideline table provides a resource: the vertical increments (more serious crime) are identical to horizontal increments (more serious criminal history). A judge who runs out of criminal history levels may read down to find the next higher range. See *United States v. Schmude*, 901 F.2d 555, 560 (7th Cir.1990) (what comes to the same thing, suggesting that the judge increase the sentence by 10–15%, the amount of each increment across or down in the guideline table).

Although the Commission did not discuss whether the same approach should be used for departures based on the seriousness of the crime, it makes sense to do so. The guidelines assign to each offense a "base" level, with points added or subtracted in response to additional considerations. For example, § 2D1.1, the main drug offense guideline, uses the quantity of drug sold or possessed to set the base offense level, then adds two levels for using a gun. Guideline § 2D1.2 provides another two-level increase if the sale took place near a school or was to underage buyers. The Commission prescribed the same method for downward adjustments. Substantial assistance to the prosecution produces a subtraction of two offense levels, and so on.

When an aggravating circumstance is sufficiently rare that the Commission does not specify the amount of the increase, the judge may depart. In departing the judge should compare the seriousness of the aggravating factors at hand with those the Commission considered. Congress prescribed the method of analogy for crimes without guidelines, 18 U.S.C. § 3553(b), and it is equally appropriate for crimes with guidelines but without sufficient detail in the lists of aggravating and mitigating circumstances. So if possessing a gun during a sale elevates the offense by two levels, the judge might conclude that buying a gun with drugs elevates the offense by four levels, an upward "departure" of two levels.

An alternate method of computing upward departures is to treat the aggravating factor as a separate crime and ask how the defendant would be treated if convicted of it. Take Ferra's case as an example. U.S.S.G. § 2B1.2 covers the receipt of stolen goods. The base offense level is 7 when the defendant purchases drugs or guns, § 2B1.2(b)(2). Because Ferra was a fence, in the business of buying stolen property, § 2B1.2(b)(3)(A) calls for an additional 4 levels. Guideline § 2B1.2(b)(1) requires a further increase if the property was worth more than $100. If Ferra purchased $500,000 worth, the amount of increase from § 2B1.1(b)(1)(M) is 12 levels. This is a total base offense level of 23, two levels above the 21 computed for his cocaine sales. The

guidelines do not merge purchases of guns and sales of drugs, U.S.S.G. § 3D1.2, because the victims differ. Under § 3D1.4 all fencing activity is a single "unit" of crime. Adding a new "unit" of crime calls for the judge to start with the most serious offense (the 23 points for receipt of stolen goods) and add two levels (from the drug sales), producing a total of 25—an effective increase of four levels from the 21 for the crimes of which Ferra was convicted. If we take Ferra's criminal history category as II, the guideline range becomes 63–78 months. If we increase the criminal history category to III on the ground that level II understates Ferra's background and dangerousness, the range becomes 70–87 months. Since this is what Ferra would have received had he been convicted of fencing, a "departure" should not exceed this level. It would throw the structure of the guidelines out of kilter to say that a defendant may receive more time on a "departure" than he could have received had he been convicted of the crimes leading the judge to depart. See *United States v. Kim*, 896 F.2d 678, 684–86 (2d Cir.1990), recommending this analogy to the grouping rules as the standard way to determine the amount of departure.

There is a third route in a case such as Ferra's, one that increases the sentencing range but is not strictly a departure. Under U.S.S.G. § 1B1.3(a)(2) all drugs that were handled as "part of the same course of conduct or common scheme or plan as the offense of conviction" should be aggregated before the application of the drug quantity tables in § 2D1.1. See *United States v. White*, 888 F.2d 490 (7th Cir. 1989). The computation of Ferra's guideline range assumed that he sold only 5½ ounces of cocaine, the amount charged in the indictment. Under § 1B1.3(a)(2) the court is supposed to add all additional amounts that were part of the same course of conduct. Suppose information in the record enabled the judge to determine that Ferra was doling out a kilogram of cocaine per year to buy stolen merchandise. That would produce a base offense level of 26, increased two levels on account of the guns. A level 28 offense produces a range

of 87–108 months for a person with a criminal history category of II, and a range of 97–121 months for someone with a criminal history category of III. So the district judge might be able to sentence Ferra to 120 months without "departing" in any way other than a one-level increase in criminal history category. But perhaps one kilogram is an overestimate of Ferra's business; we lack the information essential to an informed application of the guidelines, because the district court and the parties did not consider the effects of § 1B1.3(a)(2).

Enough of theory. What of this record and the reasons the district judge gave? If the district judge meant, as he said, to depart through the method of increasing the criminal history category, then the sentence is defective because the judge did not attempt to show why 120 months is reasonable. If the offense score is 21, jumping the criminal history category all the way to level VI (the most serious) produces a range of 77–96 months. It would be hard to justify a leap to Category VI. A parallel to one of the factors the judge considered—that Ferra continued committing crimes after the search and arrest in April 1988—is built into the computation of the criminal history. U.S.S.G. § 4A1.1(d) awards two extra points to defendants who commit crimes "while under any criminal justice sentence". A crime while on release pending trial should not be treated more seriously. A two-point increase does not get Ferra past level III. The other factor, the long-running nature of the operation with many un-charged crimes, is a recognized ground of departure, see § 4A1.3(e) (policy statement), but does not authorize skyrocketing ratings. Most criminals commit crimes in addition to those for which they have been convicted; the guidelines suppose this and authorize a downward departure for one-shot offenses. U.S.S.G. Ch. I, pt. A(4)(d). Drug offenses, in particular, are likely to involve continuing conduct. So too with receiving stolen property, which like drugs has a quantity table that aggregates the value of related transactions. Similar crimes come into the

computation through aggregation of amounts, not through departures. The "heartland" circumstances, for which the guidelines are designed, include a pattern of similar conduct, so the pattern is not a sufficient reason for departure.

If the district judge meant to depart by increasing the seriousness of the offense, the sentence is no less problematic. Again the judge did not explain why he chose 120 months. See *United States v. Carey*, 895 F.2d 318, 322 (7th Cir.1990). The best way to justify a higher sentence is to compute the full quantity of drugs involved, as § 1B1.3(a)(2) requires; the court did not make findings on this subject, however, beyond remarking that 5½ ounces is too little. Although Ferra's fencing is a serious crime, the fact that he committed some un-charged offenses is not a good reason for departure. *United States v. Missick*, 875 F.2d 1294, 1302 (7th Cir.1989). The guidelines implement a system of charge-offense sentencing. When the prosecutor elects not to charge a crime, it may not be the basis of sentence unless it was part of the offense of conviction or is related to it in a way the guidelines specify—such as through the drug quantity tables, or because the un-charged crime shows that the crime of conviction is more serious. A crime that has not been charged, and that does not reflect on the seriousness of the crime of conviction, may not be the basis of a departure, as we held in *Missick*.

Similarly, that fences make burglary more profitable (and burglary makes fencing more profitable; which is responsible?) and so leads to more burglaries, is not a reason to enhance a sentence beyond what would be appropriate for the fencing alone. Again this is because the characteristic is part of the heartland of the offense. *All* persons who buy stolen goods create this kind of injury. So too with sellers of drugs. Many people believe that in order to raise money to pay for cocaine, users commit additional crimes such as burglary. Yet this would not be a good reason to depart from the cocaine guidelines. Because it is true of the cocaine business as a whole, it does not distinguish one defendant's crime from another's and so does not justify departing from the ranges that apply to the bulk of crimes. *Carey*, 895 F.2d at 324–26; see also *United States v. Rosen*, 896 F.2d 789 (3d Cir.1990).

Ferra's fencing was part of his drug and gun business, however, so the district judge was free to consider his activities as a fence without transgressing against the charge-offense system of the guidelines. Application of the quantity tables on the authority of § 1B1.3(a)(2) should capture the significance of the whole business. If it turns out otherwise, however, the judge retains freedom to depart. In justifying such a departure, the judge should identify why the computation of the full quantity of drugs involved does not reflect the seriousness of the offense, and adjust the offense level by an amount proportional to the difference. The Commission prescribes two-level adjustments for relatively serious offense characteristics, and departures of more than two levels should be explained with a care commensurate with their exceptional quality.

Ferra raises eight additional issues. *United States v. Lewis*, 896 F.2d 246 (7th Cir.1990), disposes of one. The others do not require separate analysis. The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.