UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony DeFELIPPIS, Defendant–
Appellant.

No. 90–3603.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 4, 1991.

Decided Dec. 6, 1991.

Darilynn J. Knauss, Asst. U.S. Atty. (argued), Peoria, Ill., for plaintiff-appellee.

Suzanne Philbrick (argued), Chesterton, Ind., for defendant-appellant.

Before COFFEY and EASTERBROOK, Circuit Judges, and MORAN, Chief District Judge.*

MORAN, Chief District Judge.

Anthony DeFelippis pled guilty to two counts of bank fraud and was sentenced to 37 months on each count to run concurrently with credit for time served, together with a term of supervised release and a restitution order. His appeal relates solely to the calculation of his offense level under the sentencing guidelines. We reverse and remand for resentencing because we believe that the offense level should not have been increased by two points for obstruction of justice. We conclude that the other attacks upon the offense level calculation must fail.

The bases for the indictment were a series of increasingly grandiose financial or attempted financial transactions.

Defendant's conduct is summarized in the stipulated facts of the Plea Agreement:

"On November 4, 1988, the defendant, Anthony DeFelippis, purchased a new Mazda RX–7 automobile from Heritage Buick in Peoria, Illinois. He gave Heritage Buick a $3,000.00 check as a down payment. To obtain a loan from Commercial National Bank (CNB) to cover the balance, he submitted a financial statement. In that statement, the defendant represented that he had an annual salary of $350,000 at Thomas James Associates, that he was a part-time student at Bradley University and that he lived at 911 University, Apartment 812, in Peoria." None of that was true.

"Later in November, DeFelippis took the car into Heritage Buick for service. Because of discrepancies in the loan application, at the request of the bank the car was not released to DeFelippis. In December, the defendant called the bank and asked what the payoff would be on the car. After he was told it would be 26,319.29, he said he would bring the cash in to pay for the car.

"On January 23, 1989, the defendant applied for a $250,000 loan at CNB for "unexpected contingencies." In his financial statement, he represented that he had $15,000,000 in his Swiss bank account; had a total annual income of $2,000,000; the $2,000,000 consisting of a salary of $250,000, commissions of $500,000, and interest of $1,500,000; that he owned 500,000 shares of stock in Pan Am Corporation in the name of Anthony DeFelippis; and that he owned a condominium." Again, none of that was true.

"On January 24, 1989, the defendant went to the Dealer Financial Department of the bank with a $25,319.29 personal check written on the Citizens First National Bank of New Jersey, and demanded the release of his 1988 Mazda RX–7. The defendant was told that the check would have to clear before the car would be released." He did not have funds in his account to cover that check.

"On January 10, 1989, the defendant inquired at the bank about his $250,000 loan request. The defendant was told that it would take some time to review the financial statement and that the defendant would have an answer by the end of that day. The defendant then offered to lower his loan request to $150,000 if it would expedite the loan approval.

* The Honorable James B. Moran, Chief Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

"On January 31, 1989, the defendant returned to the bank to open a checking account. The account was opened with $100. The defendant, at that time, produced letters of intent to purchase a $360,000 penthouse apartment at the Twin Towers in Peoria from the Becker Bros. Companies. The defendant at that time was given eight temporary checks. Later that day the bank received telephone calls inquiring as to whether certain checks would clear; $1,200 for a limousine service, $1,500 for United Airlines, and $1,700 to a savings and loan in Naperville, Illinois. Also that afternoon the bank received a call from the defendant asking if the bank had received his $10,000 bank wire. No wire was received and the account was closed that afternoon.

"On March 10, 1989, the defendant was interviewed by Agents Harris and Rickard of the Federal Bureau of Investigation. During the interview, the defendant stated that the $250,000 salary, $500,000 in commissions, $1,500,000 interest, and $2,000,-000 total annual income that DeFelippis declared on the financial statements submitted to the bank were estimates of De-Felippis' income that DeFelippis thought he would earn from Griffin Moore Securities based upon DeFelippis' contact with potential corporate clients. He further stated at that time that he did not have $15,000,000 in a Swiss bank account. The defendant stated that this declaration on the financial statement was based upon a trust account that defendant's father maintained at the Bank of Switzerland in Zurich, Switzerland. He further stated that he did not own stock in Pan Am Corporation. He stated that this declaration was based upon research conducted by him of a possible stock takeover bid of Pan Am by DeFelippis. He further stated that he did not own a condominium."

After a sentencing hearing, including extensive testimony from the defendant, the court added nine points to the base offense level of four because the total attempted loss was $276,319.29, added two points for more than minimal planning, added two points for obstruction of justice, denied any two-point reduction for acceptance of responsibility, and increased the resultant offense level from 17 to 19 in an upward departure from the sentencing guidelines. Defendant objects to each of those adjustments to the basic offense level.

■ His argument for not recognizing the total attempted loss is based on "equity": there was no possibility of his obtaining the $250,000 loan and, although he did gain possession of the automobile, he gave it back. Actually, he did not give the automobile back—he returned it for repairs and the dealer held it at the request of the bank. More importantly, U.S.S.G. § 2X1.1(b)(1) provides that a decrease for an unsuccessful attempt does not apply when "the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." Defendant obtained the automobile and Judge Mihm specifically found that defendant had done all he believed he needed to do to obtain the $250,000 loan. Defendant does not indicate any basis for overturning that finding as clearly erroneous.

■ Defendant's contention that the court below was clearly erroneous in determining that more than minimal planning was involved fares no better. His repeated acts over several weeks—obtaining credit for an automobile by a falsified application, subsequently tendering a no-funds check in an effort to secure release of the automobile, seeking a $250,000 loan by another falsified application, lowering the amount sought in order to expedite the loan, and writing $4,400 in checks on a $100 account—provide ample justification for that finding. *See United States v. Lennick*, 917 F.2d 974, 979 (7th Cir.1990).

■ The trial court also added two points for obstruction of justice for providing materially false information to a probation officer in respect to the presentence investigation. *See* U.S.S.G. § 3C1.1, comment. (n. 3(h)). That information relates to defendant's status at Rosenkrantz, Lyon and Ross, a brokerage firm in Chicago. Defendant at various times, including his testimony in court, referred to his being

employed at the firm as a broker-trainee for various times ranging from a few days to two months just prior to his arrest. In fact, he never was "employed" there. At most, he had embarked upon a training program at the firm which, if successfully completed, might have led to his employment as a sales representative on a commission basis. The trial court believed defendant's representations to be considerably less than candid, that he was intending to convey the impression that he had a better status than he had. We do not disagree with that assessment and, in any event, we are constrained to accept it if it is not clearly erroneous, and it is not.

That false information must, however, be material. U.S.S.G. § 3C1.1, comment. (n. 4(c)). *See United States v. Howard,* 923 F.2d 1500, 1504–05 (11th Cir.1991). "Material" information means information that, if believed, would tend to influence or affect the issue under determination. U.S.S.G. § 3C1.1, comment. (n. 5). Whether defendant was in a program for a few days or two months, and whether or not he received any compensation were not material to the presentence investigation. Defendant, by his own representations, conceded that he was in an entry-level trainee program for a brief period before his arrest, and the factual inaccuracies in his representations could not have influenced his sentence, even if believed. Two points should not have been deducted for obstruction of justice.

■ That false information does, however, have a bearing on the trial court's rejection of a two-point reduction for acceptance of responsibility. The defendant must "clearly demonstrate a recognition and affirmative acceptance of personal responsibility for his criminal conduct. . . ." U.S.S.G. § 3E1.1(a). The clearly erroneous standard applies, *United States v. Reynolds,* 900 F.2d 1000 (7th Cir.1990), and the sentencing judge's determination is entitled to great deference on review. U.S.S.G. § 3E1.1, comment. (n. 5). Entry of a guilty plea, combined with truthful admission of involvement in the offense and related conduct, constitutes significant evidence of ac-

ceptance of responsibility, but this evidence may be outweighed by conduct inconsistent with acceptance of responsibility. U.S.S.G. § 3E1.1, comment. (n. 3).

Here the trial court heard extended testimony from the defendant, and Judge Mihm did not believe that defendant's protestations of remorse were sincere. That determination is not clearly erroneous. Defendant conceded that he had reviewed the sentencing guidelines before testifying. He then, in words, "accepted responsibility," but the sentencing judge could find, as he did, that defendant continued to rationalize and minimize his conduct, that he played "word games" and was trying to manipulate the court. Defendant's inaccurate characterization of his status at the brokerage firm, while not material (and if it had actually been an obstruction of justice that alone would have justified the denial of the two-point acceptance of responsibility deduction, U.S.S.G. § 3E1.1, comment. (n. 4)), was but one example of defendant's efforts to put a favorable spin on the information he provided.

■ Finally, we affirm the upward departure. As stated in *United States v. Gaddy,* 909 F.2d 196, 198–199 (7th Cir. 1990), our standard of review is well established:

We review a district court's departure from the Guidelines' sentencing range to determine whether it was reasonable in light of the district court's explanations for its departure at the time of sentencing. 18 U.S.C. §§ 3553(c), 3742(e)(3); *United States v. Williams,* 901 F.2d 1394, 1396 (7th Cir.1990). First we determine whether the court has adequately stated grounds that justify departure. This is a question of law and we apply a *de novo* review. *Id.* Second, we determine whether the facts that underlie the grounds for departure actually exist. *Id.* We accept the district court's factual findings unless they are clearly erroneous. *Id.* Finally, we review the degree of departure. The degree of departure must be linked to the structure of the Guidelines. *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990). We give

deference to the district court's findings on what degree of departure is appropriate so long as it adequately reflects the structure of the Guidelines. *United States v. Schmude*, 901 F.2d 555, 560 (7th Cir.1990).

The sentencing court expressly stated the grounds for an upward departure: the guidelines do not adequately reflect the seriousness of defendant's past criminal conduct or the likelihood that the defendant will commit other crimes. Those are grounds that justify an upward departure if appropriately based on prior similar adult criminal conduct not resulting in a criminal conviction. U.S.S.G. § 4A1.3(e), p.s.

The presentence report contains a wealth of information about other fraudulent conduct, for some of which defendant escaped the consequences by prevailing upon his parents and others to make good upon his debts. He wrote a bad check for $5,492.96 in December, 1988, to cover his stay in Los Angeles. Apparently he returned a month later and attempted to rent a suite on the basis of an expired American Express card. He obtained a $3,800 ring from Neiman Marcus. He subsequently obtained a $3,000 line of credit there, based on a nonexistent $200,000 he represented he had in a Paine Webber brokerage account. Defendant thereafter selected $30,000 in merchandise at Neiman Marcus, on his representation that he had been approved for a $50,000 line of credit. He ran up a $6,200 bill for a penthouse suite at a Chicago hotel. He then importuned friends to cover the bill. False representations to them that the Bank of New York was contributing to his education were apparently a factor in their coming forward. He "repaid" one of the friends with a bad check. Other bad checks were for $36,000 as a down-payment on a penthouse in Peoria, $24,000 for a Corvette, $76,000 for a Lake Point Towers condominium and $7,500 for a Chicago apartment lease application. We say "apparently" on occasion because the record is not entirely clear about the details of some of these transactions. The sentencing judge referred expressly only to the Los Angeles bad check, the Chicago hotel bill and the Neiman Marcus ring, and

the record is unclear about the acquisition of the ring. From what defendant admitted in his testimony and what is stated in the presentence report without objection by defendant, however, it is clear that defendant sought to acquire, and to a considerable extent acquired, expensive goods and services by fraudulent means and without any means to pay for them. The sentencing judge relied upon the whole pattern of uncharged conduct in concluding that the guidelines do not adequately reflect either defendant's criminal conduct or the likelihood of repetition. That conclusion was abundantly justified.

The trial court departed by increasing the offense level two points, from 17 to 19. That, with Criminal History Category I, increased the custody range from 24–30 months to 30–37 months. The manner of deciding the degree of departure gives us some pause, even though we do not believe the degree of departure was unreasonable. Upward departures in offense levels normally relate to special circumstances with respect to the charged offenses. *See* U.S.S.G. § 5K2.0, p.s. Here, however, the trial court relied upon matters apart from the charged offenses and looked to the factors relevant to the adequacy of the criminal history category, as explained in U.S.S.G. § 4A1.3, p.s. That approach is not fully consistent with the structure of the guidelines because it increased offense level for reasons related to criminal history, past and prospective. *See generally United States v. Schmude*, 901 F.2d 555 (7th Cir.1990). Still, the court by no means pitched the guidelines. *See United States v. Ferra*, 900 F.2d 1057, 1062 (7th Cir.1990). The sentencing court expressly stated that he believed that a sentence double the guideline range was appropriate but that he was constrained by the guidelines. He opted for a two-point increase in offense level for reasons that wholly justified an increase in criminal history category from I to III. And Criminal History Category III has a range, in this case, of 30–37 months. We think the sentencing judge adequately explained and justified the result and we

see no purpose in asking him to rearticulate the way he got there.

We affirm in part, reverse in part and remand for resentencing.