In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2097

United States of America,

Plaintiff-Appellee,

v.

John W. Rogers,

Defendant-Appellant.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 99 CR 977--Charles R. Norgle, Sr., Judge.

Argued September 11, 2001--Decided October 25, 2001

Before Cudahy, Easterbrook, and Williams,
Circuit Judges.

Easterbrook, Circuit Judge.  Federal
agents found in John Rogers's garage a
home-made silencer for a MAC-11
semiautomatic pistol. He has been
convicted of possessing a "firearm" (the
silencer, see 18 U.S.C. sec.921 and 26
U.S.C. sec.5845(a)(7)) not registered to
him in the National Firearms Registration
and Transfer Record. Every "firearm" (a
term of art, see Staples v. United
States, 511 U.S. 600 (1994)) must be
registered in this Record, see 26 U.S.C.
secs. 5822, 5841, by its maker and by
each transferor. The initial entry into
the Record and each transfer occasion a
$200 tax. See 26 U.S.C. secs. 5811,
5821. Possessing an unregistered firearm
is a felony. 26 U.S.C. sec.5861(d).
Rogers has been sentenced to 70 months'
imprisonment--well short of the 120-month
maximum, 26 U.S.C. sec.5871, but twice
the presumptive Guideline range for the
offense. He contests both the conviction
and the sentence.

Section 5861(d) makes it unlawful for
any person "to receive or possess a
firearm which is not registered to him in
the National Firearms Registration and
Transfer Record". Rogers possessed a
device that the jury found to be a
"firearm." He concedes that this firearm

was not registered to him. Nonetheless, Rogers insists, he did not violate sec.5861(d)--and, if he did, that sec.5861(d) is unconstitutional. His reasoning is that sec.5861(d) could not be sustained under the Commerce Clause because it does not depend on any link between the firearm and interstate commerce. Thus the legislative authority must depend on the taxing power. See United States v. Copus, 93 F.3d 269, 275-76 (7th Cir. 1996). Yet Congress has not "really" tried to raise revenues, Rogers insists, and to support this argument he observes that the Secretary of the Treasury will not register a firearm that the maker or transferee cannot lawfully possess in the state where the firearm would be kept. "Applications [for making or registering firearms] shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. sec.5822. See also 26 U.S.C. sec.5812. It is unlawful to possess any silencer in Illinois, the state where Rogers lives. See 720 ILCS 5/24-1(a)(6). Thus the Secretary would have denied an application for permission to make the silencer, and a nonexistent silencer cannot be registered and taxed.

This line of argument encounters difficulties, the first of which is that Rogers is presenting it for the first time on appeal. He says that jurisdictional arguments may be advanced at any time, but the district court had subject-matter jurisdiction. The indictment charged Rogers with an offense against the United States; no more was necessary. Courts sometimes call the link between a statute and a source of national authority a "jurisdictional" requirement, but arguments along these lines must be raised in the district court as objections to the indictment. Only limits on the adjudicatory power of the court are open at any time. We used the word "jurisdiction" loosely in Copus, the case that gave Rogers the idea that he could bypass the district court. United States v. Martin, 147 F.3d 529 (7th Cir. 1998), clarifies the different uses of "jurisdiction" by holding that proof of an interstate transaction is no different from proof of any other element of a federal crime. "[T]he nexus with interstate commerce, which courts frequently call the 'jurisdictional

element,' is simply one of the essential elements of [the offense]. Although courts frequently call it the 'jurisdictional element' of the statute, it is 'jurisdictional' only in the shorthand sense that without that nexus, there can be no federal crime . . . . It is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate a case, here authorized by 18 U.S.C. sec.3231." 147 F.3d at 531-32 (citation omitted). Martin modified earlier cases in this circuit that had occasionally failed to distinguish precisely among a "jurisdictional element" of the offense, the legislative power of Congress under Article I, and the subject-matter jurisdiction of the court. "Even if the government fails to establish the connection to interstate commerce [or some other source of national power], the district court is not deprived of jurisdiction to hear the case." 147 F.3d at 532. See also, e.g., Hugi v. United States, 164 F.3d 378, 380 (7th Cir. 1999); McCoy v. United States, 2001 U.S. App. Lexis 20900 at *14-16 (11th Cir. Sept. 25, 2001). So to get anywhere on appeal Rogers must establish plain error, Fed. R. Crim. P. 52(b), under the standards of Johnson v. United States, 520 U.S. 461 (1997), and United States v. Olano, 507 U.S. 725 (1993).

Section 5861(d) prohibits possessing any unregistered firearm; a silencer is a firearm; Rogers possessed a silencer; that silencer was unregistered. Where's the error, plain or concealed? True enough, Rogers could not have registered the silencer while it was in Illinois-- the national government will not put its imprimatur on firearms that are contraband under state law--but this differs from saying that Rogers could not have registered it at all. He just had to keep it elsewhere. (Wisconsin, for example. See Wis. Stat. sec.941.298(3)(c).) Or Rogers could have complied with both state and federal laws by refraining from making or possessing a silencer in Illinois. See United States v. Ross, 9 F.3d 1182, 1192-94 (7th Cir. 1993), remanded on other grounds, 511 U.S. 1124 (1994), decision on remand, 40 F.3d 144 (7th Cir. 1994). It was Rogers's decision to violate Illinois law that rendered him unable to comply with

federal law. That hardly implies the lack of any genuine federal interest; sec.5861(d) (and the associated sections) simply channel firearms manufacture and use (plus the associated federal taxation) to jurisdictions where that conduct is lawful, just as federal laws channel the manufacture, use, and taxation of alcohol and tobacco products, and gambling devices, to places where the underlying behavior complies with state rules.

The United States prohibits smuggling, but a smuggler still is liable for duties on the goods he imports. Extortion is unlawful in all 50 states, but extortionists must pay income tax on the pelf. Rutkin v. United States, 343 U.S. 130 (1952). The national government does not seek to raise revenue from excise taxes on the sale of tobacco products to minors, but it does not follow that a minor who buys cigarettes in violation of state law is entitled to evade the excise tax as a bonus. Just so with taxes on firearms. Rogers cites United States v. Dalton, 960 F.2d 121 (10th Cir. 1992), which held that a statute making it unlawful to possess a particular kind of firearm repealed sec.5861(d) by implication. But Ross disapproves Dalton and holds that the possibility of complying with both laws prevents any implication of repeal. Likewise with gambling, subject to federal tax but unlawful in many places. Gambling must be carried on where it is lawful--and the tax must be paid whether the gambling is lawful or not. In his reply brief, Rogers denies that he is arguing for implied repeal and insists that sec.5861(d) continues to function in states that allow silencers. Thus the more a state does to prohibit a given kind of firearm, the less the federal government does (or can do) to regulate it. Why should that be so?

The relation of secs. 5812 and 5822 to the registration requirement is replicated in other regulatory systems. Consider, for example, the dispensing of morphine and other narcotic drugs that have lawful uses. A federal license is necessary to write prescriptions for such drugs, and the license is available only to physicians in good standing. A person who has never been to medical school--or who has a medical education but has

abused his position and been convicted of a crime--is ineligible for the federal license. The line of argument Rogers uses implies that, because the federal government won't issue a license to a non-physician (or a convicted physician), such a person may dispense narcotics freely: the ban on issuing a license cancels the prohibition on unlicensed distribution. That's perverse, yet it is logically equivalent to Rogers's position that, because he can't lawfully have silencers registered in his name, he is free to make and possess them without taxation or regulation from the federal government. Nor does the argument fare better in constitutional than in statutory terms. Rogers must think that the national government lacks the power to levy any tax that has among its effects not only raising revenue (and keeping tabs on the taxable items through registration) but also diverting activity to states where the taxed conduct is lawful. Why that combination would exceed national power, when a tax simpliciter is proper, Rogers does not explain. Long ago the Supreme Court held that the taxing power may be employed to achieve a regulatory end. E.g., McCray v. United States, 195 U.S. 27 (1904); United States v. Doremus, 249 U.S. 86 (1919). The licensing and transfer taxes on firearms have been sustained despite recognition that a major, if not principal, goal is regulation rather than revenue. See Sozinsky v. United States, 300 U.S. 506 (1937). So we see no error and need not reach the additional ingredients of the plain-error standard.

The silencer was found, as we said at the outset, during a search of Rogers's garage. That search had been authorized by a warrant, and before trial Rogers asked the district court to suppress the evidence it turned up. The judge declined, ruling that the evidence narrated in the affidavit establishes probable cause. The affidavit describes an extensive investigation that followed the arrival in the mail, at the house of Dennis M. Sheehan, of a device that could have killed whoever opened the package. A small box inside the padded envelope contained a 9 mm bullet, a tube that served as a barrel, and a mechanism that would fire the bullet when the box's lid was opened. Federal agents call this a "pull-trigger device." Sheehan's wife

tried to open the box but failed; she became suspicious and took it to the police.

Asked who might have tried to kill him, Sheehan identified Rogers as a possibility. Sheehan had represented Rogers's ex-wife during child-support litigation a year earlier, and during the proceedings Rogers had become verbally and physically abusive toward Sheehan. Sheehan also suspected (through the report of a personal-injury lawyer) that Rogers may have injured himself some years earlier trying to build a bomb, then made a false insurance claim to get compensation. An investigation based on credit-card records showed that during the preceding year Rogers had purchased components of the kind used to build the pull-trigger device. His occupational background included all of the skills needed to construct such devices. Agents learned that a construction contractor who had fired Rogers years ago found three pounds of explosives wired to his truck two weeks later. Typing on the label had idiosyncrasies displayed by correspondence known to be from Rogers. All of this information, and more, was in the affidavit for the search warrant. When the agents searched Rogers's garage they found not only the silencer but also the MAC-11 (a 9 mm gun), a box of Remington Peters cartridges identical to the one in the pull-trigger device, tools suitable for constructing the pull-trigger device, and a copy of The Anarchist's Cookbook. An agent testified at trial that the silencer found in the garage had been constructed according to the instructions in this book. In a contemporaneous interview, Rogers admitted that he had built the silencer to the Cookbook's plan. (He changed his story at trial, but the jury disbelieved the new tale, and the district judge deemed the testimony perjurious.)

The district judge sensibly concluded that the information in the affidavit established probable cause. Because the search was conducted under a warrant, appellate review of this decision is deferential, Ornelas v. United States, 517 U.S. 690, 698-99 (1996); Illinois v. Gates, 462 U.S. 213, 236 (1983); Spinelli v. United States, 393 U.S. 410, 419 (1969); Jones v. United States, 362 U.S. 257, 270-71 (1960), making it all the

harder to upset. All Rogers has to say is that the package was mailed to Sheehan from a city 120 miles away from Rogers's garage in Coal City, Illinois. People often try to hide their culpability. That Rogers may have driven to a distant post office in the hope of throwing agents off the scheme hardly disables them from searching his garage. The Unabomber did not mail his packages from Montana; did that preclude agents from closing in once evidence linked Theodore Kaczynski to the crimes? Nor do we doubt that the agents were entitled to seize the MAC-11 pistol, which was linked not only to the pull-trigger device (through the size of the ammunition) but also to the silencer (which was designed to screw onto the barrel of that gun). The MAC-11 was evidence of two crimes, properly seized and properly used at trial.

The Anarchist's Cookbook also was introduced at trial. The prosecutor treated its title as significant and read the jury some passages in addition to those about building silencers. Rogers's trial lawyer did not object, but on appeal Rogers contends that this use was plain error. In some respects error occurred: The book's title may have been distracting (and was misleading: it is not about classical anarchism or about the culinary arts), and the prosecutor should have been limited to using those portions of the book pertinent to the charge. There is no problem, under either the law of evidence or the first amendment, in presenting to the jury written material in the defendant's possession that shows how to commit the crime, for this makes it more likely that the defendant rather than someone else was culpable. Dressler v. McCaughtry, 238 F.3d 908 (7th Cir. 2001). At trial Rogers contended that he had purchased the MAC-11 as part of a kit from someone who told him that the tube was an "extension" and that he had no idea that the device's function was to quiet the gun's report. Whether that is true or whether, instead, Rogers made the silencer himself knowing full well what the device did, was a subject on which some contents of The Anarchist's Cookbook were probative. But the judge had an obligation to keep the prosecutor from suggesting that Rogers should be convicted because he owned seditious literature, that anyone who would read a book called The Anarchist's

Cookbook must hold his legal obligations in contempt, or that possession of the book implied that Rogers wanted to become a sniper. See United States v. Holt, 170 F.3d 698, 701-02 (7th Cir. 1999). Still, given the weight of evidence against Rogers, and the proper use at trial of the construction plans in this book, plain-error doctrine does not support reversal.

At the close of the trial the district judge instructed the jury that conviction depended not on whether the screw-on tube actually worked as a silencer but on whether it was intended to work as a silencer. That tracks the statutory definition. See 18 U.S.C. sec.921(a)(24). See also United States v. Syverson, 90 F.3d 227 (7th Cir. 1996). The instruction also told the jury, as Staples requires, that conviction depended on proof that Rogers knew of those attributes that made the device a statutory "firearm." Nonetheless, he contends, the judge should have refused to give this (correct) instruction and should instead have told the jury that conviction depended on establishing at least some sound-muffling effect. This incorrect instruction should have been given, counsel insists, because in his opening statement the prosecutor told the jury that the amount of sound reduction is irrelevant, provided that there is some effect. This influenced the conduct of the defense, according to Rogers, and the judge should have held the United States to that position. We are unaware of any support for the proposition that a defendant has a legal entitlement to embed a legal error in a jury instruction. If the prosecutor's opening statement was misleading, then Rogers may have been entitled to extra time to present his case after the prosecutor's position became clear at the jury-instruction conference. But Rogers did not ask for an opportunity to present extra evidence, or for a mistrial; he asked only for a kind of remedy that he could not receive. (For what it is worth, we do not think that Rogers's preferred instruction would have done him any good. Expert evidence showed that the devicereduced the report of the MAC-11 by 7 decibels.)

Now we come to sentencing. Possession of an unregistered silencer has a base

offense level of 18 under U.S.S.G. sec.2K2.1(a)(5). The district court added 2 levels for obstruction of justice after concluding that Rogers committed perjury at trial. (This finding is uncontested on appeal.) Rogers has no other criminal convictions. With a criminal history category of I and an offense level of 20, his sentencing range was 33 to 41 months. The district court imposed a 70-month sentence, however, after concluding (on the basis of the mailed device) that his criminal history category understated his past dangerousness. The judge determined that a more appropriate criminal history category would be V. Then he looked up the sentencing range from the intersection of criminal history category V and offense level 21. (The rationale for the extra offense level was not explained.) That range is 70-87 months, from which the district judge selected the 70-month sentence.

The Sentencing Commission has authorized judges to depart upward from the normal range when "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes". U.S.S.G. sec.4A1.3 (policy statement). We have added that in using this power the district judge may not simply pitch out the guidelines but must abide by their structure--principally by asking what the effect on the sentencing level would have been if the defendant had been charged with, and convicted of, the other criminal conduct that the judge finds has occurred. In particular, we have held, a judge may not depart by more than would have been appropriate in the event of a conviction. See, e.g., United States v. Ferra, 900 F.2d 1057, 1061-64 (7th Cir. 1990). Uncharged conduct may be serious, and a district judge may take it into account, see United States v. Watts, 519 U.S. 148 (1997), but criminal acts (determined on the basis of a preponderance of "reliable" evidence) that have not led to a conviction cannot justify a greater enhancement than identical conduct that has led to a conviction on proof beyond a reasonable doubt.

The district court concluded that Rogers sent the pull-trigger device lacking a

specific intent to kill, but knowing that it created a risk of death or serious injury. No injury ensued. Thus the closest offenses would have been attempted second-degree murder under state law, or mailing an explosive device with attempt to injure, in violation of 18 U.S.C. sec.1716. Both offenses likely would have led to sentences exceeding one year, and thus to 3 criminal history points under U.S.S.G. sec.4A1.1(a). That would have put Rogers in criminal history category II and raised his range to 37-46 months. It does not justify a leap to category V, or a change from offense level 20 to offense level 21. The district court did not try to reconcile its approach with Ferra or our other cases describing how departures under sec.4A1.3 should be handled; we do not think that they are reconcilable.

Basing a sentence on related criminal conduct, such as the misuse of a firearm by someone convicted (as Rogers was) of a firearm record-keeping offense, usually depends on cross-references within the Guidelines, not on manipulating the criminal-history category. What the prosecutor tried to accomplish in this case by persuading the judge to pile on criminal history categories was the equivalent of a cross-reference to U.S.S.G. sec.2K3.2(a)(1), the guideline for mailing destructive devices. Because no one was injured, sec.2K3.2 points in turn to sec.2X1.1, the attempt guideline. From there the chain of cross-references would reach sec.2A2.1, which covers attempted murder, and lead (in the prosecutor's view) to an offense level of 28, which carries a range of 78-97 months even for criminal history category I. The prosecutor noted that the combination of offense level 20 and criminal history VI has a range of 70-87 months and asked the judge to use that range. The judge balked at criminal history category VI, concluding that Rogers did not intend to kill Sheehan, and fell back to criminal history category V, but then used the 70-87 month range anyway after spontaneously increasing the offense level to 21. This process, the prosecutor insists, adequately linked the sentence to the structure of the Guidelines. Perhaps so (for reasons we come to presently), but it is not the method of sec.4A1.3. It is the method of the cross-reference, and it should be used only if the applicable

guideline has a cross-reference. Otherwise the courts are disregarding the Sentencing Commission's decision to include or omit authority for cross-referencing to other crimes (and, if that authority is included, the Commission's decision to select among the possible links). Some guidelines convey cross-referencing power, a form of real-offense sentencing. Some omit it, and for these guidelines the courts are limited to charge-offense sentencing. That difference must be respected. Limits on the extent to which the Guidelines adopt a real-offense sentencing system are an integral part of the Sentencing Commission's plan. See U.S.S.G. sec.1A.4(a).

Well, then, does sec.2K2.1 allow cross references to other offenses? Yes, it does. Section 2K2.1(c)(1) reads:

If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply--

(A) sec.2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above; or

(B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

This is general: "any firearm" in connection with "another offense." It appears to cover use of the pull-trigger device (not just the silencer) as part of attempted murder. Death did not result, so sec.2K2.1(c)(1)(A) sends us to sec.2X1.1 and then, just as in the prosecutor's argument, to sec.2A2.1, the attempted-murder guideline. This guideline offers two options: offense level 28 if the defendant had the intent required for first-degree murder, and level 22 otherwise. The district court determined that Rogers did not have the intent required for first-degree murder, so we get level 22. This exceeds the level 18 base prescribed by

sec.2K2.1(a)(5), so we take level 22, add 2 for obstruction of justice, and end at level 24. For someone in criminal history category I, the sentencing range is 51-63 months. That's an increase over the starting point (33-41, recall), but not as great as the prosecutor's proposal-- and without any "departure" at all. It avoids the pitfall of trying to shoehorn a cross-reference into sec.4A1.3, and by following the language of sec.2K2.1(c) exactly, it does the cross-reference right, as the prosecutor's proposal did not.

Maybe there is a flaw in this approach that we have not detected. The district court is free to explore on remand any other avenues opened by sec.2K2.1(c). All we hold is that the district court must use the Guidelines' own methods--either departure to criminal history category II or the explicit cross reference--rather than trying to blend the departure and cross-reference approaches without following either one.

One final matter before we close. Circuit Rule 30(a) provides:

The appellant shall submit, bound with the main brief, an appendix containing the judgment or order under review and any opinion, memorandum of decision, findings of fact and conclusions of law, or oral statement of reasons delivered by the trial court or administrative agency upon the rendering of that judgment, decree, or order.

Circuit Rule 30(b)(1) also calls for:

Copies of any other opinions, orders, or oral rulings in the case that address the issues sought to be raised. If the appellant's brief challenges any oral ruling, the portion of the transcript containing the judge's rationale for that ruling must be included in the appendix.

The materials called for by Rule 30 are the tools of decision on appeal. A court cannot perform its function in reviewing the district court's decision unless it knows the reasons why those decisions were made. For most judges of this court, reading the decisions under review is the first step in the preparation of an appeal. To ensure that lawyers are aware of their obligations, Circuit Rule 30(d)

specifies that counsel must warrant to the court that their briefs comply with Circuit Rule 30(a) and (b). The clerk's office uses this as a flag: A brief missing the required statement will be returned (on the assumption that counsel was unaware of Rule 30), but a brief containing the statement will be accepted--for the clerk's office has no way to go behind the statement and determine whether counsel has included all of the required material.

The attorney representing Rogers filed a brief containing this representation (over counsel's signature): "[I certify] that all of the materials required by Circuit Rule 30(a) and (b) are included in the Appendix." The clerk's office accepted the brief for filing. But the certificate is false. The appendix to the brief contains the indictment, excerpts from a Wisconsin statute and the Code of Federal Regulations, and the affidavit supporting the search warrant--none of which is required by Rule 30, or for that matter even permitted to be in an brief's appendix by Circuit Rule 30(b)(7)--plus the judgment of conviction, the sole representative of Rule 30(a) material. What is missing is considerably more important: The district judge's ruling denying the motion to suppress, the judge's rulings concerning jury instructions, and the judge's statement of reasons for the upward departure from the Guidelines. These are the key materials required by Rule 30; none was provided. Nor did the body of the brief supply the omission. A reader of Rogers's brief would not learn that the district judge had any reasons. Counsel does not recapitulate the district judge's reasoning and then respond. The brief is written, for the most part, as if this court were to make the initial decision on all contested issues.

Compliance with Circuit Rule 30 is essential to proper performance of the appellate task, especially by those members of this court whose chambers are outside Chicago and who lack instant access to the record. Even judges with chambers in Chicago often prepare for oral argument at home or elsewhere and need the district judge's reasons ready to hand. Rogers's attorney not only failed to comply with Rule 30(a), and thus deprived the judges of essential

material, but also made a misrepresentation that prevented the clerk's office from learning of the shortcoming before the case was submitted to a panel. In civil cases one common response to such shortcomings is to dismiss the appeal. Urso v. United States, 72 F.3d 59, 61 (7th Cir. 1995); Mortell v. Mortell Co., 887 F.2d 1322, 1327 (7th Cir. 1989). In criminal cases we have deemed it inappropriate to penalize the client for the lawyer's misconduct and have resolved the appeal on the merits--as we have done in Rogers's case--while imposing sanctions on the lawyer. The normal sanction is a public rebuke and a fine of $1,000. See In re Galvan, 92 F.3d 582 (7th Cir. 1996). See also, e.g., United States v. Evans, 131 F.3d 1192 (7th Cir. 1997).

At oral argument we asked counsel to explain the false statement and deficient appendix; his response was that he had not been trial counsel and had neglected to find the required materials in the record. That may be an accurate statement of cause, but it is no excuse. Rather it compounds the offense, because it is hard to see how an appellate lawyer can represent his client effectively without first learning why the district court acted as it did. What is more, it is impossible to see how a conscientious lawyer could sign his name to the statement required by Rule 30(d) without taking the steps necessary to verify that the representation is true. Closing one's eyes and signing without regard to truth or falsity--a form of recklessness or deliberate indifference--is culpable rather than extenuating. The explanation also does not ring altogether true. Although Rogers's brief largely neglects the district judge's reasoning, it pointedly observes that at sentencing the judge rejected the prosecutor's contention that Rogers had mailed the pull-trigger device with intent to kill, finding instead that Rogers had been reckless. So counsel must have reviewed the transcript of sentencing and should have put in the appendix the portions containing the district judge's reasons. His explanation thus does not give us any reason to deviate from the practice adopted in Galvan.

The conviction is affirmed but the sentence is vacated, and the case is

remanded for further proceedings consistent with this opinion. The motion for bail pending appeal (which we ordered taken with the case) is denied. Counsel is reprimanded for making a misrepresentation to the court and fined $1,000 (payable within 10 days) for violating Circuit Rule 30.