# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-2882

A.M., a minor ,

*Petitioner-Appellee,*

v.

JERRY BUTLER, Superintendent of the
Illinois Youth Center,

*Respondent-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5625—**Rebecca R. Pallmeyer**, *Judge.*

_____

ARGUED SEPTEMBER 18, 2003—DECIDED MARCH 2, 2004

_____

Before EASTERBROOK, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In 1993, 83-year-old Anna Gilvis was savagely beaten and stabbed to death in her home. Eleven months later, Anthony Morgan,[1] who was 10 years old at the time of the murder, was charged with the crime and adjudged a delinquent after a 2-day trial in the Cook

_____

[1] This is not the petitioner's real name. We use it only to avoid awkwardly referring to him by his initials, "A.M."

County Court Juvenile Division. Given the paucity of options available under Illinois law for an 11-year-old offender, Morgan received a modest sentence—5 years probation.[2] The Appellate Court of Illinois affirmed his delinquency adjudication, and the state supreme court denied leave to appeal. Morgan then filed a petition for federal habeas corpus relief which the district court granted. *United States ex rel. A.M. v. Butler*, 2002 WL 1348605 (N.D. Ill.). The State of Illinois appeals.

Before reaching the merits, we address two matters, the first being whether this appeal is moot because Morgan, who is now 20 years old, finished serving his probation term over 4 years ago. Although neither side challenges our jurisdiction—indeed, in supplemental filings, both insist that the case is *not* moot—a federal court at any stage of the proceedings must, on its own, dismiss a case as moot when it cannot give the petitioner any effective relief. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Calderon v. Moore*, 518 U.S. 149, 150 (1996). The inability to review moot cases stems from the requirement of Article III of the Constitution which limits the exercise of judicial power to live cases or controversies. *Spencer*, 523 U.S. at 7. "Federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *D.S.A. v. Circuit Court Branch 1*, 942 F.2d 1143, 1145 n.2 (7th Cir. 1991) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Here, Morgan was still on probation when he filed his habeas petition in 1998.[3] He completed his probation term

---

[2]  After the adjudication, we are told that "A.M. was then detained in the Illinois Youth Center in St. Charles, Illinois. A.M. fulfilled this sentence and was released."

[3]  His probation status means he was "in custody" at the time he filed his habeas petition, so he fulfilled the jurisdictional require-

(continued...)

while his petition was pending in the district court. Although no longer in custody, however, a challenge to a criminal conviction (or, in this case, a declaration of juvenile delinquency, which is its equivalent for a child) is not moot when the defendant continues to face adverse consequences stemming from its adjudication. Thus, in determining if Morgan's petition is moot, we must examine "whether sufficient collateral consequences of the conviction persist to give the petitioner 'a substantial stake in the judgment of conviction which survives the satisfaction of the sentences imposed on him.'" *Puchner v. Kruziki*, 111 F.3d 541, 543 (7th Cir. 1997) (quoting *Carafas v. La Vallee*, 391 U.S. 234, 237 (1968)). This standard applies equally to juvenile adjudications. *D.S.A.*, 942 F.2d at 1145-50.

Applying these principles, we think Morgan's petition is not moot. Examining Illinois law, Morgan has a stake in the outcome of this litigation. For example, one aggravating factor under Illinois' Aggravated Unlawful Use of a Weapon statute is whether a defendant has previously been adjudicated a delinquent for an act that if committed by an adult would be a felony. 720 ILCS 5/24-1/6(a)(3)(d); *People v. Marin*, 795 N.E.2d 953 (Ill. App. Ct. 1st Dist. 2003). A first-time conviction under this statute is a Class 4 felony. 720 ILCS 5/24-1/6(d). In contrast, without a juvenile adjudication as an aggravating factor, the comparable crime would be Unlawful Use of a Weapon, a Class A misdemeanor. 720 ILCS 5/24-1. The difference in potential sentences is significant. If treated as a felony, the possible sentence is 3 years imprisonment. 730 ILCS 5/5-8-1(7). In contrast, if considered a misdemeanor, the maximum sentence would be less than one year. 730 ILCS 5/5-8-3 (1). Because Morgan's delinquency adjudication will, like an

---

(...continued)

ment of § 2254(a). *Spencer*, 523 U.S. at 7. However, this does not mean that he escapes mootness. *Id.*

adult criminal conviction, increase his potential punishment in the future, we agree with the parties that his petition is not moot.[4]

The second pre-merits matter is the State's breach of our rules in prosecuting its appeal. In large part, the outcome of this appeal depends on our assessment of how the case was resolved by the Appellate Court of Illinois. And to facilitate our review, one of our most important rules, Circuit Rule 30, requires that important opinions from other courts be given to us in either an appendix to the appellant's main brief or in a separate appendix. Circuit Rule 30(a) provides that "[t]he appellant shall submit, bound with the main brief, an appendix containing the

---

[4] *Spencer v. Kemna*, 523 U.S. 1 (1998), does not lead to a different conclusion. In *Spencer*, the Court held that the presumption of collateral consequences that applies to criminal convictions, *see*, *e.g.*, *Sibron v. New York*, 392 U.S. 40, 55-56 (1968), does not apply for parole revocations. *Spencer*, 523 U.S. at 12. As a result, the petitioner had the burden of establishing that such consequences exist, something the petitioner could not do. Most relevant to our inquiry, the Court found insufficient to keep the controversy alive the fact that the petitioner's parole revocation remained on his record and might be used by a future sentencing judge or employer. *Id.* at 13. The Court specifically noted that since these were "nonstatutory consequences," any higher sentence the petitioner faced in the future or any adverse employment affects were "dependent upon '[t]he discretionary decisions . . . made by an employer or a sentencing judge' . . . ." *Id.* (internal citation omitted). Because Morgan faces a statutory consequence, *Spencer* is not a good fit for denying consideration of the merits of Morgan's petition. As a result, it is not necessary to determine whether the *Spencer* Court's decision not to extend the presumption of collateral consequences applies equally to juvenile delinquency or if the holding is limited to parole revocation. *Cf. id.* at 8 ("[T]he first question we confront is whether the presumption of collateral consequences which is applied to criminal convictions will be extended as well to revocations of parole.").

judgment or order under review and any opinion, memorandum of decision, findings of fact and conclusions of law, or oral statement of reasons delivered by the trial court . . . ." Circuit Rule 30(b)(4) calls for "[c]opies of all opinions, by any . . . state appellate court previously rendered in the criminal prosecution, any appeal, and any earlier collateral attack." These materials must be submitted as part of the appendix to the main brief or in a separate appendix. See Circuit Rule 30(b)(7). The decision of the Appellate Court of Illinois, the most important decision by the state courts in this case, falls squarely within our rule.

The State's counsel, Lisa Anne Hoffman, signed a certification saying that her brief contains, in its appendix, "all of the materials required under Circuit Rule 30(a) and (b)." This certification was false: the opinion of the Appellate Court of Illinois is nowhere to be found. As we have said, a breach of Rule 30 is "not a 'nit-picky' violation. Failure to supply necessary documents goes to the heart of this court's decision-making process." *Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 225-26 (7th Cir. 1996). The purpose of the rule is to give us, at our fingertips, the materials we consider most important to discharging our duties. The materials called for by Rule 30 "are the tools of decision on appeal," and "[c]ompliance with Circuit Rule 30 is essential to proper performance of the appellate task . . . ." *United States v. Rogers*, 270 F.3d 1076, 1084 (7th Cir. 2001). The State's failure here is a material breach of our rules.

Sanctions for failure to comply with Rule 30 may include dismissal of the appeal, *see, e.g.*, *Urso v. United States*, 72 F.3d 59, 61 (7th Cir. 1995); *Mortell v. Mortell Co.*, 887 F.2d 1322, 1327 (7th Cir. 1989), or imposition of a penalty on the offending lawyer, including a public rebuke and fine. *See, e.g.*, *In re Galvan*, 92 F.3d 582 (7th Cir. 1996); *United States v. Evans*, 131 F.3d 1192 (7th Cir. 1997). Although we will

not dismiss this appeal, when we finish our work we will return to the question of an appropriate sanction.

Finally, before leaving our pre-merits concerns, we note another error in the State's principal brief, plus an argument that is much ado about nothing. First, on page 4 of its main brief, when referring to the Illinois Appellate Court decision (the one not included in any appendix!), the State says it is a "published decision." This is wrong. The decision was not "published." It is not retrievable on any electronic database nor is it printed in any book. Second, the State complains that the district court improperly conducted an evidentiary hearing on Morgan's petition. Yet the State fails to point to any material "use" of the information elicited at the hearing. Rather, the district court ultimately accepted the historical facts found by the Illinois Appellate Court, so where is the harm caused by the federal hearing? Because none is cited, we dismiss the State's objection on this point and now move to the merits of this appeal.

Morgan lived with his mother, Janet Tims, next door to the house where the elderly Gilvis lived, apparently alone. On October 5, 1993, she was found dead in her home, the victim of a terrible crime: she had been beaten with her cane; her throat was slit; she was tied with a phone cord; blood was all over the place; and her purse, with its contents spewed out, was found on the kitchen floor.

Police interviewed a number of neighbors after discovering Gilvis's body. Morgan, who as we said was 10 years old, was in his backyard when Detective Guy Habiak, who was in Gilvis's backyard, conversed with him over a fence. Morgan, who was with an unidentified adult female, said that around 7 p.m. the evening before, he saw a black man walk down the gangway to the back door of the victim's home. He then heard a squeaking or pounding noise. He also said he saw Gilvis an hour later walking down the street with plastic bags filled with liter bottles. He said he

helped her carry her bags but did not go into her house. He said she thanked him and he went home.

It was not until 11 months later that the police again contacted Morgan, who by then had turned 11 years old.[5] Detectives James Cassidy and Edward Schmidt knocked on Morgan's door, he answered, and Cassidy told him, "We need to ask you a few questions involving a murder." Tims then came to the door, and the police repeated that they wanted to question Morgan. Tims allowed the detectives to speak with her son.

The detectives and Morgan sat in a police car, parked outside Morgan's home. The detectives told Morgan they were investigating Gilvis's murder and understood that he had seen someone around the time she was killed. Morgan then went beyond the statement he gave 11 months earlier to Detective Habiak. He talked about a man by the name of Nolan Coleman, who lived in a basement unit of the house where he (Morgan) lived. Morgan said the man moved a week and a half after the murder. According to Morgan, on the night of the murder Coleman asked him to watch his kids while he "took care of some business." Morgan also related that Coleman told two black men that the elderly white woman next door (Gilvis) had a lot of money and that she didn't like black people. Morgan went on to say that he heard Coleman tell the two men to break in and get the money and that he (Coleman) would be a lookout. Coleman then told Morgan to "get out of here if you know what's good, get away from the back yard."

After hearing this story, the detectives asked Tims if they could take Morgan to the police station to continue their investigation. Tims agreed. At the police station, Morgan sat at a desk and looked at photos. He then told an assis-

---

[5] The police attributed the delay to the fact that Morgan and his mother moved to a different house and could not be located.

tant state's attorney the same story he had told the detectives. Detective Cassidy then drove Morgan home, and a judge issued an arrest warrant for Coleman. After being arrested and interrogated extensively, Coleman denied any involvement in the murder.

The next day, Detective Cassidy called Tims and said he wanted to bring Morgan back to the station for further questioning. She gave her permission and asked whether she should accompany him, but Cassidy told her it was not necessary. Two detectives then picked Morgan up and brought him to the station. Once there, Cassidy told Morgan that Coleman was in custody and that he denied being involved in Gilvis's murder. According to Cassidy, Morgan then said, "I want to tell you what really happened." He said his prior statements were not true and that he actually saw Coleman go into Gilvis's home with a baseball bat. Morgan said he followed him in and saw Coleman beat Gilvis with the bat, drag her to the bathroom, take out a knife, and stab her. Coleman saw him there and told him to "keep [his] mouth shut" if he "knew what was good for [him]."

Cassidy told Morgan he didn't believe this story; why, he said, would Coleman have let Morgan go if Morgan actually witnessed the murder? Cassidy emphasized to Morgan that he had only told lies up to that point and that he needed to tell the truth. Morgan then changed his story again. He said Coleman asked him to be a lookout while he went inside to rob Gilvis. At some point, Morgan entered the home and saw what he described earlier.

Cassidy again accused Morgan of lying. According to Cassidy, Morgan then started crying and declared, "I hated her and I killed her. She called me a nigger almost every day." Cassidy testified that, at this point, he "didn't say anything to him. [Morgan] just kept going and talking and talking." Morgan said he struck Gilvis with her cane,

tied her up, got a knife, and stabbed her. Cassidy testified that at no point did he ask Morgan any questions, instead he just sat in shock "at the hatred he saw in [Morgan's] words and actions." After hearing these words, Cassidy summoned an assistant state's attorney, Steve Klaczynski, to join them. He also called Tims but got no answer. When Klaczynski arrived, they were joined by a youth officer (who, as far as we can determine, did nothing to help Morgan in his predicament).

Klaczynski read Morgan his *Miranda* rights, which Morgan said he understood. Cassidy asked Morgan to tell Klaczynski and the youth officer what Morgan had told him. Morgan repeated the same story but added that after the murder he threw his dirty clothes in a dumpster.

About an hour later, the police reached Tims, and she came to the station. Morgan, Tims, and Klaczynski spent the next hour talking, and Klaczynski again advised Morgan of his rights. Both Morgan and Tims responded that they understood what was said. Morgan, however, backtracked again and told his mother "I didn't kill anybody." Tims asked Morgan, "Well, did you tell these men here that you had done it?" and Morgan said, "Yes, I did. I told them I did it." Tims replied, "Well, if you didn't do it, why did you tell them that." He responded, "I don't know, I just did."

Later, Klaczynski told Cassidy that Morgan did not want to tell his mother what he did. According to Cassidy, Morgan and Tims then left the room, and in the hall Cassidy told Morgan to tell his mother what he had earlier confessed to. Morgan then told Tims, "I hated her and I killed her." Cassidy testified that Tims said, "You didn't kill her, did you?" to which Morgan responded, according to Cassidy, "Yes I did, I hated her." At Morgan's trial, which started, ironically, on the one-year anniversary of Gilvis's murder, Tims completely denied this version of events. She

testified that Morgan repeatedly told her, "I said I murdered her, but I didn't do it." Morgan himself testified that he didn't murder Gilvis and that he only "confessed" because Cassidy cursed and yelled at him. Morgan also said that Cassidy's partner pounded on his knees, told him his fingerprints were on the murder weapon, and said that if he confessed, God and the police would forgive him and he could go home in time for his brother's birthday party.

Based solely on his statements, since the State offered absolutely no physical evidence tying Morgan to the murder, he was adjudicated delinquent on a charge of first-degree murder.[6] No pretrial challenge to the admissibility of his statements—on either *Miranda* or voluntariness grounds—was lodged. Based on the failure to move to suppress his statements (and the court's failure to conduct a hearing on their admissibility *sua sponte*), Morgan appealed to the Illinois appellate court, which affirmed, in a 2-1 decision, the delinquency adjudication. The appellate court concluded that the police considered Morgan a witness, not a suspect, and thus that *Miranda* warnings did not have to be given prior to his inculpatory statements. The court also determined that Morgan was not "in custody" when he gave his statements because no reasonable person in his position would have believed he was under arrest. The court also

---

[6] Our dissenting colleague blithely ridicules our decision to grant relief to the petitioner "even though he killed Anna Gilvas" and "confessed" to the crime. But that statement is true only if what Morgan told the police was true. If what he said was involuntarily extracted from him—and promises that he would be forgiven by God and allowed to go to his brother's birthday party if he "confessed" (more on this later) could do the trick—then his "confession" was not reliable. Sometimes people "confess" to things they didn't do, and that danger is certainly a possibility when the person is an 11-year-old placed in an intimidating situation. That's why, we think, a clean determination of voluntariness was required.

held that his statements were voluntary. For all these reasons, the court determined that Morgan's counsel was not ineffective for failing to challenge, in a motion to suppress, the admissibility of Morgan's statements.

Petitions seeking federal habeas relief are now governed by the familiar, and restrictive, rules spelled out in the Antiterrorism and Effective Death Penalty Act (AEDPA). A federal court may only grant relief under AEDPA if the decision of the state court "was contrary to, or involved an unreasonable application of, clearly establish Federal law, as determined by the Supreme Court of the United States." In *Williams v. Taylor*, 529 U.S. 362, 405, 407 (2000), the Court explained that a state court decision is "contrary to" Supreme Court precedent if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. An unreasonable application of Supreme Court precedent occurs when "the state court unreasonably applies it to the facts of the particular state prison's case" or "unreasonably extends a legal principle . . . to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." To be unreasonable, the decision of the state court must not be simply incorrect or erroneous, it must have been "objectively unreasonable." *Wiggins v. Smith*, 123 S. Ct. 2527 (2003).

Applying AEDPA, the district court concluded that Morgan was entitled to habeas relief on his claim that he was denied his Sixth Amendment right to the effective assistance of counsel during the proceedings in the juvenile court. This determination rests on the district court's conclusion that Morgan was, contrary to the Appellate Court of Illinois' finding, "under arrest" and "in custody" when he gave his inculpatory statements and that they were involuntary. Because Morgan had finished serving his

probation sentence when the district court entered its order, it invited the parties to submit suggestions as to an appropriate remedy. After entertaining arguments, the court issued an order vacating Morgan's adjudication of delinquency and expunging his record unless the State indicated a desire to give him a new trial.

The question for us is whether the Appellate Court of Illinois' decision that there was no underlying constitutional violation with regard to whether Morgan was in custody, whether he was seized, whether his confession was voluntary, and whether he was denied the effective assistance of counsel was "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court. *Williams*, 529 U.S. at 404-05.[7] If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) (counsel's deficient performance must have so prejudiced the defense that the defendant was denied a fair trial). We review the decision of the district court *de novo*, but "with a grant of deference to any *reasonable* state court decision." *Anderson v. Cowan*, 227 F.3d 893, 897 (7th Cir. 2000) (emphasis in original).

We begin with the Illinois court's decision that Morgan was not in custody when he gave his statements. We agree with the district court that this decision was "contrary to" established federal law. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court recognized that "in-custody interrogation" places "inherently compelling pressures" on persons interrogated. *Id.* at 467. Thus, to safeguard the

---

[7] In *Williams*, the Court held that the "contrary to" and "unreasonable application" clauses represent alternative grounds for habeas relief. *Williams*, 529 U.S. at 404-05.

Fifth Amendment privilege against self-incrimination, *Miranda* warnings are required for custodial interrogation. *Id.* at 444. The Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (duty to give *Miranda* warnings is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody'").

In determining whether a person is "in custody," the question is whether, examining the totality of the circumstances, a reasonable person in the petitioner's position would have felt "at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). In making this determination, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). The Court is clear that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). *See also, Maine v. Thibodeau*, 475 U.S. 1144, 1146 (1986).

With that in mind, the following is the full extent of the Illinois court's discussion on whether Morgan was in custody:

> In deciding whether an interrogation was custodial for *Miranda* purposes, the trial court must first evaluate evidence and weigh the testimony of the witnesses to determine: "the location, length, mood, and mode of the interrogation; the number of police officers present; and indicia of formal arrest or evidence of restraint; the intentions of the officers; and the extent of the knowledge of the officers and the focus of the investiga-

tion." *People v. Brown*, 136 Ill. 2d 116, 124-25, 554 N.E.2d 216, 220 (1990). Then the trial court should ascertain what a reasonable person, innocent of any crime, would perceive under similar circumstances. *Brown*, 136 Ill. 2d at 125, 554 N.E.2d at 220.

The factors surrounding [Morgan's] interrogation only lead to the conclusion that *he was considered a witness.* He was treated well and returned home the first day. The second day he agreed to return to the police station alone and he spoke with the same officers. He was not handcuffed, photographed, or fingerprinted. Under the circumstances of [Morgan's] visit to the station, a reasonable, innocent person would not believe he was under arrest.

Detective Cassidy testified that [Morgan's] demeanor changed right before he made his confession. He "bursted out crying, his eyes got large, he started shaking, and his chest was heaving upward." His confession followed this change in behavior, and Detective Cassidy testified that he was stunned and could not speak. *The detective's reaction to [Morgan's] confession showed that he was considered a witness up to that point.*

While giving lip service to the objective standard, stating that the trial court must "ascertain what a reasonable person, innocent of any crime, would perceive under similar circumstances," the Illinois court shunned this objective test, substituting instead a focus on the subjective belief of Detective Cassidy. The court stressed that Cassidy believed Morgan was merely a witness and, for that reason, *Miranda* warnings were not required. That is not, however, the correct inquiry under Supreme Court precedent. No weight can be given to the subjective belief of Detective Cassidy. *Stansbury*, 511 U.S. at 325. That the Illinois court not only relied on Cassidy's belief, but did so substantially, adds

weight to our conclusion that the court's decision was "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 405-06 (a state court's decision is "contrary to" clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases").

Nor is the State correct now when it says "the district court chose to focus on one portion of the appellate court's discussion" and on only a "short excerpt from the opinion." This argument exaggerates the comprehensiveness of the state court's decision. We have just quoted the entire discussion regarding Morgan's custodial interrogation. The focus on Cassidy's subjective belief, rather than being only a "short excerpt," was the main emphasis of the opinion. While the court, citing *People v. Brown*, 136 Ill. 2d 116, 124-25 (1990), acknowledged other factors relevant to whether an interrogation is custodial, we cannot ignore that the principal articulated reason for its determination that Morgan was not in custody was Cassidy's subjective belief that Morgan was only a witness. *See Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) ("[T]he better the job the state court does in explaining the grounds for its rulings, the more likely those rulings are to withstand further judicial review."); *Aycox v. Lytle*, 196 F.3d 1174, 1178 n.3 (10th Cir. 1999) ("A state court's explanation of its reasoning would avoid the risk that we might misconstrue the basis for the determination, and consequently diminish the risk that we might conclude the action unreasonable . . . .").

Even without this error, the court's evaluation of the totality of the circumstances, *see, e.g., Thompson*, 516 U.S. at 112, was objectively unreasonable. The "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing principle from [Supreme Court] decisions but unreasonably applies that principle to the facts" of the petitioner's case. *Wiggins*, 123 S. Ct. at 2534-35. Where the state court's application of federal law is challenged, it must

be shown to be not only erroneous, but objectively unreasonable. *Id.* We believe this case meets this high standard.

At the outset, we note that, in making the objective inquiry, Morgan's age is an important factor. *See Alvarado v. Hickman*, 316 F.3d 841, 851 (9th Cir. 2002), *cert. granted*, 156 L. Ed. 2d 703 (2003) (age was a factor in determining whether reasonable person would have felt at liberty to terminate the interrogation and leave); *United States v. Erving L.*, 147 F.3d 1240, 1248 (10th Cir. 1998) ("Given these facts, *a reasonable juvenile* in E.L.'s position would not have believed that the officers had curtailed his freedom of movement to a degree associated with formal arrest.") (emphasis added). This is consistent with the inquiry in determining whether a confession or a waiver of a constitutional right was voluntary, *see*, *e.g.*, *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (a defendant's "maturity" is one of the factors used to determine if a defendant's confession was voluntary), and we see no valid reason why a similar analysis should not apply equally to an "in custody" determination. Every jurisdiction that has squarely addressed the issue, moreover, has ruled that juvenile status is relevant, either as a factor under the totality of circumstances test or by modifying the usual reasonable person standard. *See Alvarado*, 316 F.3d at 850 n.5 (reviewing state law regarding evaluating whether a juvenile is in custody). And *Alvarado* involved a *17*-year-old. Morgan was only 11 when he sat alone in the police interrogation room.

With Morgan's age in mind, we turn to the circumstances of this case and note first that Morgan was not a seasoned juvenile delinquent. In fact, he had no prior experience with the criminal justice system when he was questioned for almost 2 hours in a closed interrogation room with no parent, guardian, lawyer, or anyone at his side. Since the police told his mother it was unnecessary for her to come to the station, he was at the mercy of the detectives to drive

him home. Thus, he had no way of leaving the police station even if he felt he could leave. Nor was he ever told he was free to go or that he was not under arrest. Furthermore, compare this encounter with the police with his prior two, where he sat in a police car outside his own home and then at a desk in a public area of the police station, all while the police were "nice" to him. Finally, there are significant concerns regarding the mode of questioning. Morgan insisted that the detectives leaned closely in towards him when they spoke, promising him that both God and the police would forgive him for what he did, and assuring him that if he told the truth he could go home to his brother's birthday party. Cassidy denied these activities but acknowledged that he was close enough to touch Morgan and that he repeatedly told Morgan that he was lying. All of these facts lead to the conclusion that a reasonable person in Morgan's situation would have considered his freedom curtailed. *See, e.g., Alvarado*, 316 F.3d at 854-55 (17-year-old subjected to 2-hour interrogation was in custody; "[I]t is simply unreasonable to conclude that a reasonable 17-year-old, with no prior history of arrest or police interviews, would have felt that he was 'at liberty to terminate the interrogation and leave.'") (citation omitted); *cf. California v. Beheler*, 463 U.S. 1121, 1122-25 (1983) (no custody found where suspect was told he was not under arrest and was allowed to leave after only 30-minute interview); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (no custody where suspect was told immediately that he was not under arrest and interview lasted only 30 minutes). The Illinois Appellate Court's decision to the contrary was, we believe, an objectively unreasonable application of federal law.

We next turn to the Illinois court's decision that Morgan was not under arrest for Fourth Amendment purposes when

he made his statements.[8] If a statement is obtained through exploitation of an illegal arrest, it must be suppressed. *Brown v. Illinois*, 422 U.S. 590, 604 (1975); *Dunaway v. New York*, 442 U.S. 200, 217 (1979). An unlawful arrest occurs when a person is seized by police without probable cause. Whether a person has been seized is determined by considering whether a reasonable person, innocent of any crime, would have concluded that he was not free to leave police custody. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

We agree with the district court that the Illinois court's resolution of whether Morgan was seized was contrary to established Supreme Court precedent. A decision is "contrary" to established precedents if the court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing *Williams*, 529 U.S. at 405-06). Here, in a case with facts virtually identical to this case, the Supreme Court wrote:

> [T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

*Dunaway*, 442 U.S. at 212. *Dunaway* further emphasized that the fact that the petitioner was not told he was under

---

[8] The State concedes that the police did not have probable cause to arrest Morgan. It argues instead that he was not in fact seized, or under arrest, for purposes of the Fourth Amendment.

arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless was not relevant. *Id.*

We see no meaningful distinction between *Dunaway* and this case. Like the defendant in *Dunaway*, Morgan was taken directly to an interrogation room in the police station. He was never told he was free to go. Cassidy, moreover, testified that he would not have allowed Morgan to leave even if Morgan said he wanted to go home. In fact, the only significant difference here is that, while Dunaway was an adult, Morgan was, at best, a sixth-grader. Remarkably, the Illinois court did not even make an attempt to distinguish Morgan's situation from the situation in *Dunaway*.

The Illinois court's conclusion that Morgan was not under arrest was also objectively unreasonable. In making its determination, the Illinois court, citing *People v. Matthews*, 205 Ill. App. 3d 371, 402-03 (1st Dist. 1990), correctly acknowledged that courts rely on the same factors in determining whether a person is in custody. The court again, however, based its decision on Detective Cassidy's subjective beliefs. It wrote, "The evidence of [Morgan's] interrogation prior to his confession indicates that he was considered a witness only. . . . The focus of the police investigation had always been on adult suspects." The court did not mention that Morgan was alone, his age, his prior inexperience with the criminal justice system, or the fact that the interrogation took place in a closed police room. Nor did it acknowledge that Morgan was dependent on the police for transportation home, and Cassidy testified that he would not have let Morgan go. And, while Morgan was never told he was not free to leave, he was also not told he was free to leave, either. All these factors lead to only one conclusion—on the basis of this record, Morgan was, for all practical purposes, under arrest within the meaning of the Fourth Amendment when he made his inculpatory statements.

Finally, the state court's decision regarding whether Morgan's confession and waiver of his Fifth Amendment right to remain silent was voluntary was objectively unreasonable. A voluntary relinquishment of a right occurs when a waiver is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In evaluating voluntariness, we are required to examine the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Among other factors, a court must examine the juvenile's age, experience, education, background and intelligence, prior experience with the criminal justice system, whether the questioning was repeated or prolonged, and the presence or absence of a friendly adult such as a parent or an attorney. *Michael C.*, 442 U.S. at 725-26. In fact, the Supreme Court has consistently recognized that a confession or waiver of rights by a juvenile is not the same as a confession or waiver by an adult. A defendant's age is an important factor in determining whether a confession is voluntary. *See, e.g.*, *Withrow*, 507 U.S. at 693 (maturity is factor in assessing the voluntariness of a confession); *Michael C.*, 442 U.S. at 725 ("Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination."); *Schneckloth*, 412 U.S. at 226 (stating that the determination whether consent to search a car was voluntary is made under the totality of circumstances, including the "youth of the accused"); *In re Gault*, 387 U.S. 1, 45 (1967) (when assessing the voluntariness of juvenile confessions, a court must exercise "special caution," particularly when there is prolonged or repeated questioning or when the interrogation occurs outside the presence of a parent, lawyer, or friendly adult); *Gallegos v. Colorado*, 370 U.S. 49, 54-55 (1962) (a confession of a 14-year-old

cannot be compared to that of an adult.); *Haley v. Ohio*, 332 U.S. 596, 599 (1947) ("[W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used.").

The reasoning of *In re Gault* is important:

> [T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*In re Gault*, 387 U.S. at 55-56.

Based on these principles, we recently recognized:

> Although we may not apply a *per se* rule, youth remains a critical factor for our consideration, and the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted the juvenile's confession.

*Hardaway v. Young*, 302 F.3d 757, 765 (2002), *cert. denied*, 123 S. Ct. 1802 (2003).

Here, the circumstances weigh in favor of a determination that Morgan's inculpatory statements were involuntary. When Morgan sat, alone, in the police interrogation room,

he was not even old enough to be caddy on a golf course under Illinois law.[9] And to repeat, he had no prior experience with the criminal justice system. Detective Cassidy continually challenged Morgan's statement and accused him of lying, a technique which could easily lead a young boy to "confess" to anything. No friendly adult, moreover, was present during the questioning.[10] When a youth officer was brought in, there is no evidence that he did anything to protect Morgan's rights. As we made clear in *Hardaway*, "a state-provided youth officer who functions as nothing more than an observer will not be considered a friendly adult presence for purposes of the totality of the circumstances." *Hardaway*, 302 F.3d at 765. Finally, after the first inculpatory statement was uttered, Morgan was given a standard version of his rights.[11] *Cf. Michael C.*, 442 U.S. at

---

[9] *See* § 20 ILCS 205/2, which sets 13 as the minimum age for caddies in Illinois. Illinois law also severely limits children under the age of 16 from doing almost any kind of work.

[10] As the Supreme Court has said, a juvenile in police custody needs "the aid of more mature judgment as to the steps he should take in [his] predicament. . . . [A]n adult relative . . . could have given [the juvenile] the protection which his own immaturity could not." *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962). Of course, the Supreme Court has never required *per se* the presence of an adult, *see Michael C.*, 442 U.S. at 718, but it is, however, a significant factor in considering the "totality of the circumstances." In fact, "in marginal cases—when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings—lack of parental or legal advice could tip the balance against admission." *United States v. Wilderness*, 160 F.3d 1173, 1176 (7th Cir. 1998).

[11] There is no reason to believe that this 11-year-old could understand the inherently abstract concepts of the *Miranda* rights and what it means to waive them. *See*, Grisso, "Juvenile's Capacities to Waive *Miranda* Rights: An Empirical Analysis," **68**

(continued...)

726-27 (a 16-year-old juvenile voluntarily and knowingly waived his Fifth Amendment rights under an interrogation where he had considerable experience with the police and had his *Miranda* rights explained to him); *United States v. Male Juvenile*, 121 F.3d 34, 40 (2nd Cir. 1997) (confession voluntary after juvenile had rights explained to him by FBI agent). A comparison with *Hardaway* is relevant. There, "with the gravest misgivings," we held that a state court's decision that a confession by a 14-year-old with extensive prior history with the criminal justice system, including 19 arrests, was not involuntary was not unreasonable. *Hardaway*, 302 F.3d at 759. In contrast, here, Morgan was 3 years younger and inexperienced with the police. Considering these facts, we cannot say the state court's decision was reasonable. The statements should have been suppressed. At the very least, the admissibility of his statements—on *Miranda* and voluntariness grounds—should have been vigorously challenged in pretrial motions by his counsel. Not to have done so compels the conclusion that counsel was ineffective.

We recognize that under AEDPA we must give deference to the state court's judgment. However, as the Supreme Court has noted, "[e]ven in the context of federal habeas,

(...continued)
Calif. L. Rev. 1134, 1141-42, 1153-54, 1160 (1980) (finding that 96 percent of 14-year-olds lack an adequate understanding of the consequences of waiving their rights). Moreover, psychological studies argue that juveniles are highly susceptible to adults' suggestions. *See, e.g.,* Maggie Bruck & Stephen J. Ceci, "The Suggestibility of Children's Memory," 50 Ann. Rev. Psychol. 419 (1999). Journalists have also recently reported on children's susceptibility to adults' suggestions during interrogations. *See, e.g.,* Alex Kotlowitz, "The Unprotected," *The New Yorker*, Feb. 8, 1999, at 46, 48; Margaret Talbot, "The Maximum Security Adolescent," *N.Y. Times*, Sept. 10, 2000, 6 (magazine), at 41, 88.

deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This case exemplifies that principle. Here, where the only evidence tying Morgan to Gilvis's murder was his statement given under highly questionable circumstances, the filing of a suppression motion by his counsel would not have been, as the Illinois court said, a futile act.

Finally, we return to the Circuit Rule 30 violation we noted earlier in this opinion. We have repeatedly emphasized the importance of compliance with Circuit Rule 30. In *United States v. Rogers*, 270 F.3d 1076 (7th Cir. 2001), we said:

> Compliance with Circuit Rule 30 is essential to proper performance of the appellate task, especially by those members of this court whose chambers are outside Chicago and who lack instant access to the record. Even judges with chambers in Chicago often prepare for oral argument at home or elsewhere and need the district judge's reasons ready to hand.

270 F.3d at 1085.

Years ago, we issued mere warnings to attorneys who failed to comply with Rule 30. *See Mortell v. Mortell Co.*, 887 F.2d 1322 (7th Cir. 1989); *United States v. White*, 888 F.2d 490 (7th Cir. 1989); *United States v. Bond*, 847 F.2d 1233 (7th Cir. 1988). More recently, we have imposed both a reprimand and a $1,000 fine for Rule 30 violations. *Rogers*, 270 F.3d at 1085, and *United States v. Evans*, 131 F.3d 1192 (7th Cir. 1997). We will stay true to that practice here. Accordingly, we reprimand attorney Hoffman and give her 14 days to show cause, if any she has, why she should not be fined $1,000 for noncompliance with Rule 30.

The judgment of the district court is AFFIRMED. The State is ORDERED to expunge Morgan's adjudication of delinquency unless it gives him a new trial within 120 days.

EASTERBROOK, *Circuit Judge*, dissenting. Nothing turns on the outcome of these proceedings, which therefore are moot. A.M. was adjudicated a juvenile delinquent and sentenced to five years' probation. Before the district court made its decision, the term of probation had expired. That left no work for a writ of habeas corpus to do.

As the Supreme Court observed in *Spencer v. Kemna*, 523 U.S. 1, 7-14 (1998), a number of decisions hold that collateral consequences will be presumed, and thus mootness avoided, when a criminal sentence expires while a petition for habeas corpus is pending. See, e.g., *Sibron v. New York*, 392 U.S. 40 (1968); *Carafas v. LaVallee*, 391 U.S. 234 (1968); *Pollard v. United States*, 352 U.S. 354 (1957). Although it declined to revisit those decisions, *Spencer* held that they cannot be extended to other upshots of criminal conduct, such as revocation of parole. See also *Lane v. Williams*, 455 U.S. 624 (1982). Challenges to these events become moot, the Court held, at the end of custody, unless the petitioner establishes ongoing injury. 523 U.S. at 14.

Although my colleagues assert that juvenile adjudications are treated just like criminal convictions, the only opinion cited for that proposition—*D.S.A. v. Circuit Court Branch 1*, 942 F.2d 1143 (7th Cir. 1991)—precedes *Spencer* and cannot be reconciled with it. The view underlying *D.S.A.* is that collateral attacks never become moot if they begin during the petitioner's custody, and this is the precise proposition that the Supreme Court rejected in *Spencer*. We should start with the Supreme Court's own question: is a juvenile adjudication in Illinois a "criminal conviction"? It does not appear to be one. Illinois calls it an "adjudication" precisely so that later in life persons who violated the law can say "no" to the question "have you ever been convicted of a crime?" A juvenile adjudication in Illinois does not carry the normal disabilities of a conviction; 705 ILCS 405/5-150(2) provides that the adjudication does not "disqualify a minor from subsequently holding public office

. . . [or] operate as a forfeiture of any right, privilege or right [sic] to receive any license granted by a public authority." It is not a "conviction" that would bar A.M. from lawfully owning a weapon. When *In re Gault*, 387 U.S. 1 (1967), held that juveniles are entitled to many of the safeguards used in adult prosecutions, it did so not because the proceedings were "criminal" (juveniles long have been spared the criminal process) but because the result could be a loss of liberty. Juveniles receive counsel not under the sixth amendment, which applies to criminal prosecutions, but under the due process clauses of the fifth and fourteenth amendments. 387 U.S. at 550-54. Thus neither Illinois law nor the federal Constitution designates A.M.'s adjudication as a "criminal conviction."

Because A.M. cannot benefit from the presumption established in *Sibron* and *Carafas*, he must demonstrate a specific continuing injury. My colleagues point to only one (slip op. 3): a delinquency adjudication for an act that would be a crime, if committed by an adult, may be used to increase the sentence in an adult prosecution for aggravated unlawful use of a weapon. 720 ILCS 5/24-1.6(a)(3)(D). Yet both *Spencer* and *Lane* consider and disapprove the proposition that a risk of sentence enhancement in the future justifies federal adjudication today. Here is what the Court said:

> Petitioner's second contention is that the Order of Revocation could be used to increase his sentence in a future sentencing proceeding. A similar claim was likewise considered and rejected in *Lane*, because it was contingent upon respondents' violating the law, getting caught, and being convicted. "Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring." *Lane*, *supra*, at 633, n.13. We of course have rejected analogous claims to Article III standing in other contexts."

> "[W]e are . . . unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction." *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974).

> See also *Los Angeles v. Lyons*, 461 U.S. 95, 102-103 (1983).

*Spencer*, 523 U.S. at 15. See also *Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998) ("Consequences that are within the power of the defendant to avoid—such as a sentencing enhancement, which presupposes his deciding to commit another crime—are excluded [from the set of effects that avoid mootness]"). Exposure to a higher sentence under 720 ILCS 5/24-1.6(a)(3)(D) comes within these principles. A.M. is obliged to refrain from aggravated (or any) unlawful use of a weapon. He does not need a federal court's assistance to avoid a sentencing enhancement; all he has to do is keep on the right side of the law. What he is seeking today—what my colleagues give him—is not an end to injury at the state's hands but emotional balm, a declaration that even though he killed Anna Gilvis his trial lawyer and the police also committed wrongs, so that his confession should have been suppressed.

Because the majority thinks that the case remains live, I treat the merits briefly. My colleagues hold that A.M.'s confession should be suppressed not only because the police failed to give him *Miranda* warnings but also because it was involuntary. The cornerstone of their approach is that "custodial interrogation" means different things according to the age of the person being questioned. The leading authority cited for this view (slip op. 16) is *Alvarado v. Hickman*, 316 F.3d 841 (9th Cir. 2002), cert. granted

under the name *Yarborough v. Alvarado*, 124 S. Ct. 45 (2003) (to be argued March 1, 2004). It may be, as the ninth circuit asserted, 316 F.3d at 850 n.5, that many appellate courts have concluded that "custodial interrogation" depends on the suspect's age—though this introduces the kind of subjective element that my colleagues soundly decry elsewhere in their opinion. (It is subjective because age serves as a proxy for the suspect's mental state.) Still, the ninth circuit is not the Supreme Court, and under 28 U.S.C. §2254(d) a collateral attack fails unless the state adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(Emphasis added.) No decision by the Supreme Court of the United States has "clearly established" that the suspect's age affects the need to give *Miranda* warnings. It is therefore not possible to say that the Appellate Court of Illinois rendered a decision "contrary to" or entailing "an unreasonable application of" that nonexistent body of law. Certiorari has been granted in *Alvarado* to consider the ninth circuit's view that law may be treated *as if* clearly established by the Supreme Court, whenever inferior courts should have projected that law would evolve along those lines. That position—an essential, though unmentioned, component of my colleagues' decision—clashes with the text of §2254(d)(1) and *Tyler v. Cain*, 533 U.S. 656 (2001), which held that the identical phrase in 28 U.S.C. §2244(b)(2)(A) does not permit lower courts to anticipate legal developments at the Supreme Court. The idea behind §2254(d)(1) and similar provisions is that legal change should occur, if at all, on

direct appeal and not collateral attack. See also *Teague v. Lane*, 489 U.S. 288 (1989). It is therefore unnecessary for me to address the substance of the majority's position, though I doubt the wisdom of (let alone constitutional compulsion for) injecting suspect-specific variables into the definition of "custodial interrogation." See *Berkemer v. McCarty*, 468 U.S. 420, 432 (1984) (mechanical operation of *Miranda* is its chief virtue and should not be compromised without "a compelling justification").

The state's appellate court did not contradict, or apply unreasonably, any principles clearly established by the Supreme Court of the United States. A.M. was not taken to the stationhouse against his will. He discussed the Gilvis murder with the police on multiple occasions. Each time he pointed the finger at a third party. Each time he left freely, or was taken home, after the conversation. A reasonable person in his position would not have deemed the circumstances on the day he implicated himself to be any different. The police initiated this discussion only after receiving his mother's consent; seeking a parent's consent to talk to a child undermines any inference that the child has been taken into "custody"—or so the state judiciary could conclude without contradicting or applying unreasonably the standard understanding of "custodial interrogation." See *Stansbury v. California*, 511 U.S. 318 (1994) (collecting authority). My colleagues err in analogizing this situation to *Dunaway v. New York*, 442 U.S. 200 (1979). Dunaway was taken away against his wishes (which is to say, he was arrested) so that the police could grill him about his own deeds; A.M. went to the stationhouse by parental consent to discuss evidence A.M. had given against third parties. There is a constitutional gulf between these things. Only later did A.M. withdraw his accusations and proclaim his own role, and then *Miranda* warnings were given.

To the extent that the majority believes that A.M. was "arrested" without probable cause and that the confession

should have been suppressed under the fourth amendment as a "fruit" of improper custody, there is still a further problem: *Stone v. Powell*, 428 U.S. 465 (1976), holds that the exclusionary rule cannot be applied on collateral attack if the state court offered full review, which it did here. See *Hampton v. Wyant*, 296 F.3d 560 (7th Cir. 2002). Moreover, *Stone* cannot be circumvented by complaining that counsel's failure to invoke the exclusionary rule was ineffective assistance. See *Holman v. Page*, 95 F.3d 481 (7th Cir. 1996).

As for the conclusion that A.M.'s confession was involuntary: the majority has made an independent decision and labeled the state court "unreasonable" for reaching a different one. That approach—which recites the form of §2254(d)(1) while disregarding its substance—is just a continuation of the *de novo* approach that prevailed before the AEDPA was enacted in 1996. A state court's decision does not become "unreasonable" just because a federal court thinks it to be incorrect. See *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000); *Mitchell v. Esparza*, 124 S. Ct. 7, 11-12 (2003); *Yarborough v. Gentry*, 124 S. Ct. 1 (2003). Evidence in this record permitted the state judiciary to rule as it did without overstepping the bounds allowed by a reasonableness standard. The police did not attempt to overbear A.M.'s will or treat him poorly. Officers did not hold him for extended periods. An adult counselor was present to monitor the officers and assist A.M. (The majority implies that the counselor behaved like a potted plant, but the record does not show this; it would be better to say that the record does not establish what the counselor did. The presence of an adult witness, available to testify if need be, deters the police from overreaching even if the adult is silent during the interview.) Finally, A.M. repeated his confession five times after the interview. Even when his mother told him to stop, A.M. continued to proclaim his culpability.

Unless juveniles age 11 simply are not allowed to confess—much of my colleagues' discussion implies that this is their view—there was no reason to suppress this confession. See *Colorado v. Connelly*, 479 U.S. 157 (1986). Yet a conclusion that A.M. was too young to confess would be the sort of legal development that cannot be fastened on the state in collateral proceedings. It also would not be consistent with the law of this circuit. See *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002); *United States v. Wilderness*, 160 F.3d 1173 (7th Cir. 1998); see also *Young v. Walls*, 311 F.3d 846 (7th Cir. 2002), which holds that a retarded suspect with a mental age at or below A.M.'s could give a voluntary confession, because he had enough concrete intellect to understand the questions. That, and more, can be said of A.M., whose statements demonstrate command of the events surrounding Anna Gilvis's death and awareness of his words' significance. The statement that A.M. gave and repeated carried indicia of trustworthiness, providing details that were corroborated by the medical examiner's conclusions (details that A.M. had no way of knowing unless he were the killer). Perhaps confessions by youngsters deserve less weight, but A.M.'s juvenile adjudication was a trial to the court; judges who specialize in juvenile hearings are best situated to apply the appropriate discount factor. The federal judiciary should let them do their jobs.

I cannot resist offering a few remarks about the role ineffective assistance of counsel has played in these proceedings. A.M.'s lawyer did not ask the state judge to suppress his confession. Normally that would forfeit this contention and preclude its assertion on collateral review. A.M. used a claim of ineffective assistance to overcome this forfeiture, and on appeal the state is content to argue the merits. In some future case it would be worth exploring this subject with greater care. Does the ineffective-assistance doctrine apply *at all* in juvenile adjudications? *Strickland v. Washington*, 466 U.S. 668 (1984), treats the requirement of

competent legal work as an aspect of the sixth amendment's right to counsel. Yet the sixth amendment does not apply to juvenile adjudications and, as *Gault* holds, any entitlement to counsel rests on the due process clause. It is not clear to me that the full body of sixth amendment jurisprudence carries over to juvenile adjudications.

Then there is the problem that the sixth amendment itself does not create a right to counsel in a criminal prosecution that concludes without a sentence of imprisonment. See *Scott v. Illinois*, 440 U.S. 367 (1979); *Argersinger v. Hamlin*, 407 U.S. 25 (1972). A.M. was not sent to prison, and it is not clear whether the time he spent at the Illinois Youth Center is equivalent to prison for constitutional purposes. If he lacked a constitutional entitlement to counsel, necessarily he lacked a constitutional entitlement to effective counsel. See *Wainwright v. Torna*, 455 U.S. 586 (1982). Now it is true that *Alabama v. Shelton*, 535 U.S. 654 (2002), holds that a suspended sentence should be treated as a form of imprisonment for purposes of the right to counsel, because the suspension can be lifted, and the same understanding likely governs youth probation. But *Shelton* was decided well after the state proceedings against A.M. had run their course, so under *Teague* and §2254(d)(1) it does not affect this federal collateral attack.

Perhaps Illinois has bypassed these issues because the state judiciary itself considered the suppression arguments on the merits, without treating counsel's failure to make a pretrial motion as a default foreclosing the inquiry. This means in turn that no state default rule blocks federal collateral review. See *Harris v. Reed*, 489 U.S. 255 (1989). It also means that today's assumptions about the scope of ineffective-assistance claims on collateral review of juvenile adjudications do not affect the law for future cases, in which the issue matters and is debated between the litigants.

Finally, a comment about the wretched performance by the Attorney General of Illinois. The state ignored the

Article III problem in its briefs and did not mention *Spencer*, *Lane*, or *Diaz* even after we directed the parties to file supplemental memoranda on that subject. The state has ignored the fact that the suppression issue was not preserved in state court. The leading issue in the state's brief concerned the evidentiary hearing in the district court—though as my colleagues rightly observe this played no role in its decision and therefore is irrelevant to the appeal. The brief's discussion of the constitutional questions was shallow. Most of the doctrines and decisions on which I have relied in this opinion were unmentioned. Bad law often ensues when lawyers neglect vital subjects.

Then there is the state's violation of Circuit Rule 30(b)(4) and the false representation counsel made to the court under Circuit Rule 30(d). These now yield embarrassment for an Assistant Attorney General, likely followed by a fine. In the future an equivalent violation should lead us to dismiss the appeal, a sanction regularly employed in civil litigation. *Urso v. United States*, 72 F.3d 59 (7th Cir. 1995); *Mortell v. Mortell Co.*, 887 F.2d 1322, 1327 (7th Cir. 1989); *Teitelbaum v. Curtis Publishing Co.*, 314 F.2d 94, 95 (7th Cir. 1963); *Sparrow v. Yellow Cab Co.*, 273 F.2d 1 (7th Cir. 1959); *Chicago & Eastern Illinois Ry. v. Southern Ry.*, 261 F.2d 394, 400 (7th Cir. 1958). We have used fines, rather than dismissals, in criminal appeals in order to protect defendants from their lawyers (and avoid follow-on claims of ineffective assistance). *United States v. Gomez*, 24 F.3d 924, 928-30 (7th Cir. 1994); *United States v. Smith*, 953 F.2d 1060, 1068 (7th Cir. 1992); cf. *Guentchev v. INS*, 77 F.3d 1036 (7th Cir. 1996). There is no equivalent need to protect Illinois from its own Attorney General, and no reason not to treat appeals in collateral attacks like those in other civil litigation. Persons who have enjoyed a direct appeal followed by collateral review in state court and a decision by a federal district judge have had their day in court, and then some.

A true Copy:

     Teste:

                  _____

                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*